1  LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
   100 Pine Street, Suite 2600
3  San Francisco, CA 94111
   Telephone: 415/288-4545
4  415/288-4534 (fax)
   shawnw@lerachlaw.com
5     – and –
   DARREN J. ROBBINS (168593)
6  TRAVIS E. DOWNS III (148274)
   655 West Broadway, Suite 1900
7  San Diego, CA 92101
   Telephone: 619/231-1058
8  619/231-7423 (fax)
   darrenr@lerachlaw.com
9  travisd@lerachlaw.com

10 Attorneys for Plaintiff
   [Additional counsel appear on signature page.]

11

12              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
13                  SAN JOSE DIVISION

14 DENNIS K. WEBB, Derivatively on Behalf of )  No. **C  07  4048**  **PVT**
   McAFEE, INC.,                            )
15                                          )  VERIFIED SHAREHOLDER DERIVATIVE
                   Plaintiff,               )  COMPLAINT FOR VIOLATION OF THE
16                                          )  FEDERAL SECURITIES LAWS AND
         vs.                                )  STATE LAW CLAIMS FOR BREACH OF
17 GEORGE SAMENUK, STEPHEN C.               )  FIDUCIARY DUTY, ABUSE OF
   RICHARDS, KEVIN M. WEISS, KENT H.        )  CONTROL, CONSTRUCTIVE FRAUD,
18 ROBERTS, ERIC F. BROWN, LESLIE G.        )  CORPORATE WASTE, UNJUST
   DENEND, ROBERT M. DUTKOWSKY,             )  ENRICHMENT, GROSS
19 DENIS J. O'LEARY, ROBERT W. PANGIA,      )  MISMANAGEMENT, BREACH OF
   ROBERT B. BUCKNAM, LIANE S. WILSON, )      CONTRACT, ACTION FOR ACCOUNTING
20 DALE L. FULLER, VERNON EUGENE            )  AND VIOLATION OF CALIFORNIA
   HODGES, SYLVIA GARCIA-LECHELT,           )  CORPORATIONS CODE
21 EVAN S. COLLINS, WILLIAM L. LARSON,      )
   DENNIS L. CLINE, ZACHARY A. NELSON,      )
22 PETER R. WATKINS, ARTHUR MARTIN,         )
   PRABHAT K. GOYAL, VIRGINIA               )
23 GEMMELL and EDWIN HARPER,                )
                                            )
24                 Defendants,              )
                                            )
25      – and –                             )
                                            )
26 McAFEE, INC., a Delaware corporation,    )
                                            )
27                 Nominal Defendant.       )
                                            )  DEMAND FOR JURY TRIAL
28

ORIGINAL
FILED

AUG – 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**INTRODUCTION AND OVERVIEW**

1.      This is a shareholder derivative action brought by Dennis Webb, a shareholder of McAfee, Inc., formerly known as Network Associates, Inc. and McAfee Associates, Inc. ("McAfee" or the "Company"), on behalf of the Company against its Board of Directors ("Board"), including its former Chairman of the Board of Directors and Chief Executive Officer ("CEO"), George Samenuk ("Samenuk"), former Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") Stephen C. Richards ("Richards"), former General Counsel Kent H. Roberts ("Roberts") and other current and former directors and senior executives of the Company (collectively, "defendants").

2.      This action seeks to remedy defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement arising out of a scheme and wrongful course of business whereby defendants diverted hundreds of millions of dollars of corporate assets to themselves via the manipulation of the grant dates and associated documentation of stock options granted to McAfee insiders, a scheme commonly known as "backdating." Each of the defendants participated in the concealment of the option backdating scheme complained of herein and/or refused to pursue the Company's legal rights to require defendants to disgorge the hundreds of millions of dollars in illicitly obtained incentive compensation and insider trading proceeds diverted to them.

3.      As Securities and Exchange Commission ("SEC") Chairman Christopher Cox recently explained before Congress, options backdating is a nefarious and illegal practice by which a stock option is reported as having been granted on one date, but is actually backdated weeks or months to a date when the stock price was trading at a lower price. Such backdating allows corporate executives and other stock option grantees to realize immediate unearned and undisclosed financial gains at the expense of the corporation and its shareholders.

4.      As Chairman Cox further explained, backdating stock option grants undermines the key purpose of option-based executive compensation, *i.e.*, to provide incentive to improve the Company's performance and increase the Company's stock price. By manipulating options such that they carry a strike price lower than the trading price of the stock at the time of option grant,

1  executives profit immediately upon the award of the option without doing anything to improve the

2  Corporation's business or financial condition.

3      5.      It was not until just recently that the practice of backdating came to public attention.

4  On March 18, 2006, *The Wall Street Journal* published an article describing the practice and noting

5  that executives at certain companies had received options dated on some of the days of the year with

6  the lowest stock prices for several years in a row. According to the study cited in the article, the

7  chances against such patterns occurring by chance were "astronomical" and, in some cases, as low as

8  one in 300 billion.

9      6.      Defendants' stock option grants mirror the astronomically unlikely pattern of repeated

10  options granted on some of the lowest trading prices of the year that *The Wall Street Journal*

11  concluded that it could only be the result of backdating. For example:

12      •      In 1997, executives received options that were purportedly granted on the day with
             the second lowest closing price of the year. One of the executives that received a
13             grant on this day, defendant Zachary A. Nelson ("Nelson"), had not yet started
             working at McAfee.

14
        •      The next year recipients of McAfee options fared even better, receiving grants dated
15             on the day that had the lowest closing price of 1998.

16      •      In 1999, one executive received a grant dated on the day that had the lowest closing
             price of the year, others received grants with the third lowest closing price of the
17             year.

18      •      In 2000, defendant Roberts received a grant reflecting the lowest closing price for the
             first half of the year.

19
        •      In 2001, several executives and the employees received grants reflecting the lowest
20             closing price of the year. One executive who started in April of 2001, defendant
             Richards, received a grant for the lowest day of April, even though it was neither his
21             hire date nor his employment start date.

22      •      Also in 2001, executives of McAfee.com, a subsidiary of McAfee, received a grant
             of stock that was purportedly granted on January 31, 2001, but bore the exercise
23             price for January 3, 2001, the lowest day of the year for McAfee.com stock.

24      •      In 2002, Arthur Matin ("Matin"), a friend of defendant Samenuk from IBM, received
             a grant dated on the day with the lowest closing price of the year. Another,
25             defendant Roberts, received a grant reflecting the day with the lowest closing price of
             the first half of the year. Other executives received grants dated on, or simply
26             reflecting the closing price of, the day with the lowest closing price in January.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 2 -

1    7.    The Board approved these improper grants which concealed from shareholders an

2  enormous transfer of money from the Company to the individual executives. Indeed, many of the

3  board members themselves also received improperly dated options.

4    8.    Former SEC Chief Accountant Lynn Turner has described stock option backdating as

5  "allowing people to place bets on a horse race after the horses have crossed the finish line."[1]  And

6  former Chairman of the SEC, Arthur Levitt, said that backdating "is ripping off shareholders in an

7  unconscionable way" and "represents the ultimate in greed."  It is also beyond dispute that

8  backdating unequivocally violates both the federal securities laws and state corporate fiduciary laws.

9  As former SEC Chairman Harvey Pitt recently opined:

10    Many discussions of backdating options start with the observation that backdating is
     not, per se, illegal.  That is wrong.  *Options backdating frequently involves*
11    *falsification of records used to gain access to corporate assets.*  That conduct
     violates the Foreign Corrupt Practices Act and its internal controls requirements.  If
12    corporate directors were complicit in these efforts, state law fiduciary obligations are
     violated.  *Backdating is not only illegal and unethical, it points to a lack of*
13    *integrity in a company's internal controls.*

14    9.    At McAfee, between 1996-present (the "Relevant Period") defendants perpetrated

15  one of the most egregious backdating schemes of all.  They pocketed hundreds of millions of dollars

16  in excessive compensation and illegal insider trading proceeds as a result of the backdating scheme.

17  By contrast, McAfee has suffered tremendous damages and injuries.  Among other things,

18  defendants' scheme has: (a) diverted hundreds of millions of dollars of corporate assets to senior

19  McAfee executives; (b) caused McAfee to issue false financial reports to shareholders, exposing it to

20  liability for violations of securities laws; (c) subjected McAfee to substantial investigative costs and

21  massive potential liability from regulators, including the SEC, the Department of Justice ("DOJ")

22  and the Internal Revenue Service ("IRS"); (d) damaged McAfee's credibility with investors; and (e)

23  subjected McAfee to the costs of restating nearly four years of financial statements.

24    10.    Specifically, defendants caused McAfee to make materially false statements in its

25  shareholder reports through Company press releases, statements to the public and documents filed

26  _____

27  [1]    All emphasis is added and citations and quotations are omitted unless otherwise noted.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    - 3 -

1  with the SEC. For example, due to defendants' conduct, the Company repeatedly issued false

2  statements concerning the manner in which the Company administered its stock option and incentive

3  compensation plans ("stock option plans"), falsely stating that the Company's stock option grants

4  were priced as of the grant date of the option and only became valuable if the stock price increased

5  thereafter:

6       The Company believes that stock options are critical in attracting and retaining these
        key contributors. *The Incentive Plan is intended to offer a significant incentive by*
7       *enabling key employees to acquire options to purchase Common Stock at a price*
        *equal to its fair market value on the date the option is granted. The options will*
8       *become valuable to the recipients only if the price of the Company's Common*
        *Stock appreciates following the grant and when such options have vested.* By
9       providing key employees with the opportunity to acquire an equity interest in the
        Company over time and because a benefit is only received through improved stock
10      performance, the Company believes that stock options serve to align the interests of
        key employees closely with other stockholders.
11
     McAfee shareholders routinely relied upon the false Proxy Statements issued by the Company and
12
     voted for and adopted amendments to the Company's Stock Option Plan under which defendants
13
     manipulated and backdated stock option grants in order to enrich themselves at the expense of the
14
     Company.
15
        11.    During the Relevant Period, the Board stated that one purpose of changes to
16
     McAfee's Stock Incentive Plan in 1997 was to "eliminate the ability of the Company's Board of
17
     Directors (the 'Board') to grant options thereunder with an exercise price less than the fair market
18
     value of the Company's Common Stock on the date of grant."
19
        12.    Additionally, defendants caused the Company to falsely state in McAfee's Form
20
     10-Ks that under Accounting Principles Board ("APB") Opinion No. 25:
21
        *The Company accounts for stock-based compensation using the intrinsic value*
22      *method prescribed by APB Opinion No. 25,* "Accounting for Stock Issued to
        Employees." Accordingly, compensation cost for stock options is measured as the
23      excess, if any, of the quoted market price of the Company's stock at the date of the
        grant over the amount an employee must pay to acquire the stock. . . .
24
        13.    In addition to making untrue statements about the administration of the Company's
25
     stock option plan, defendants, by failing to appropriately account for backdated options, caused the
26
     Company to falsely present its financial condition to shareholders and investors in its quarterly and
27
     fiscal year financial reports. Defendants Samenuk and Eric F. Brown ("Brown") assured
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                      - 4 -

1  shareholders that they had investigated and reviewed the Company's internal controls processes and

2  financial statements and authorized their inclusion in the Company's public filings. Indeed, each

3  signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §§302 and

4  906, affirmed that:

5      [T]he financial statements, and other financial information included in this report,
       fairly present in all material respects the financial condition, results of operations and
6      cash flows of the registrant as of, and for, the periods presented in this report;

7                              *        *        *

8              (a)      Designed such disclosure controls and procedures, or caused such
       disclosure controls and procedures to be designed under our supervision, to ensure
9      that material information relating to the registrant, including its consolidated
       subsidiaries, is made known to us by others within those entities, particularly during
10     the period in which this report is being prepared;

11             (b)      Designed such internal control over financial reporting, or caused
       such internal control over financial reporting to be designed under our supervision, to
12     provide reasonable assurance regarding the reliability of financial reporting and the
       preparation of financial statements for the external purposes in accordance with
13     generally accepted accounting principles;

14                             *        *        *

15             5.      The registrant's other certifying officer and I have disclosed, based on
       our most recent evaluation of internal control over financial reporting, to the
16     registrant's auditors and the Audit Committee of the registrant's board of directors
       (or persons performing the equivalent functions):

17
               (a)      All significant deficiencies and material weaknesses in the design or
18     operation of internal control over financial reporting which are reasonably likely to
       adversely affect the registrant's ability to record, process, summarize and report
19     financial information; and

20             (b)      Any fraud, whether or not material, that involves management or
       other employees who have a significant role in the registrant's internal control over
21     financial reporting.

22     14.     False Sarbanes-Oxley confirmations were filed with the SEC on October 31, 2003,

23  March 9, 2004, March 31, 2005 and March 1, 2006.

24     15.     In fact, defendants knew but failed to disclose that they had engaged in a practice of

25  backdating or misdating stock option grants to themselves and to other McAfee executives in a

26  manner designed to create immediate and risk-free profits in direct contravention of the Company's

27  stated and shareholder-approved stock option plan and Proxy Statements filed with the SEC.

28  Furthermore, defendants knew that because the Company had not taken a compensation expense for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                           - 5 -

1  backdated options, McAfee's reported earnings and expenses were false and misleading and not in
2  compliance with Generally Accepted Accounting Principles ("GAAP"). Thus, by falsifying the date
3  on which options were granted, defendants materially understated McAfee's expenses and overstated
4  its income and falsely represented that it had not incurred any expenses for option grants.

5       16.   During the Relevant Period, it was reported that McAfee's executives were becoming
6  "obsessed" with the Company's share price. McAfee executives "were getting wildly wealthy, and
7  became extremely aggressive with bookkeeping and accounting and managing sales channels." Matt
8  Murray, *The Wall Street Journal*, December 17, 2002, "Stock-Option Frenzy: What Went Wrong?"
9  Apparently, this obsession led to both the SEC investigation into channel stuffing and the regular
10  backdating of stock options to many senior executive officers and other McAfee employees.

11       17.   While at McAfee, defendants William L. Larson ("Larson") and Prabhat K. Goyal
12  ("Goyal") often instructed that option grants to McAfee senior executives and employees be
13  backdated.[2] After Larson and Goyal were terminated in December 2000 in relation with McAfee's
14  channel stuffing activities, Samenuk took over as CEO and continued to backdate stock options.

15       18.   In 2000 and 2001, Samenuk, Roberts and Senior Vice President of Worldwide
16  Human Resources defendant Sylvia Garcia-Lechelt ("Garcia-Lechelt"), were instrumental in
17  backdating option grants to senior executives, often with the knowledge and consent of the
18  Company's most senior executives. Garcia-Lechelt was primarily responsible for administering
19  option grants to senior executives at this time. Garcia-Lechelt regularly met with Samenuk, Roberts
20  and others to discuss option granting practices.

21       19.   Defendants were highly motivated to mask the unlawful backdating and its impact on
22  the Company's financials. In fact, many of the Company executives, including defendants Samenuk,
23  Richards, Roberts, Nelson, Matin, Vernon Eugene Hodges ("Hodges"), Larson, Dennis L. Cline
24  ("Cline"), Peter R. Watkins ("Watkins") and Goyal took home millions in incentive bonuses
25  substantially tied to the Company's financial performance.

26

27    [2]     At the time, McAfee was known as Network Associates.

28

20.    More importantly, at the same time that defendants caused the Company to covertly issue backdated stock options and issue false financial reports, McAfee insiders were busy unloading their McAfee shares for trading proceeds, an astonishing $253 million of which represented unlawful profits from the exercise and sale of backdated or misdated stock options:

### McAfee, Inc. Insider Sales:
### March 11, 1996 - Present

| Name | Shares[3] | Proceeds |
| --- | --- | --- |
| Bolger, John | 16,000 | $762,080 |
| Carver, David | 15,000 | $780,060 |
| Cline, Dennis | 253,175 | $7,852,813 |
| Davis, Terry | 6,736 | $124,616 |
| Denend, Leslie | 571,712 | $19,268,857 |
| Duryea, R. Terry | 327,933 | $8,161,076 |
| Gemmell, Virginia | 28,438 | $981,034 |
| Goyal, Prabhat | 208,438 | $8,119,834 |
| Harper, Edwin | 56,626 | $1,760,118 |
| Hodges, V. Gene | 636,375 | $16,781,173 |
| Kerrigan, William | 22,914 | $558,925 |
| Kortschak, Walter | 12,656 | $86,413 |
| Kreysar, Richard | 92,808 | $2,170,621 |
| Larson, William | 2,946,051 | $86,509,329 |
| Matin, Arthur | 100,000 | $1,966,000 |
| Mehta, Bakulesh | 88,420 | $2,332,391 |
| Nelson, Zachary | 69,020 | $2,554,879 |
| Poteet, Darrell | 54,692 | $1,219,987 |
| Richards, Stephen | 350,000 | $6,323,912 |
| Roberts, Kent | 270,416 | $6,836,621 |
| Saal, Harry | 5,010 | $179,525 |
| Samenuk, George | 1,682,400 | $41,680,142 |
| Stringer, John | 70,501 | $2,662,910 |
| Watkins, Peter | 543,495 | $18,531,298 |
| Weiss, Kevin M. | 150,000 | $4,201,018 |
| Woodward, Mark | 339,659 | $10,957,090 |
| **TOTAL** | **8,905,821** | **$253,276,309** |

21.    Compounding the damage from these illegal option grants, in January 2006, McAfee entered into a consent decree with the SEC, enjoining the Company from violating numerous provisions of the federal securities laws. The consent decree, which also included a $50 million fine, resulted from a fraudulent scheme to overstate the Company's revenue and earnings by over $600 million through "channel stuffing," in which the Company improperly recorded sales to distributors

---

[3]    Share numbers are adjusted for splits.

1   as revenue, and repurchased unsold inventory through an undisclosed subsidiary. Defendant

2   Roberts, fired in May 2006 for an improper episode related to option grants, signed the consent

3   decree on behalf of the Company. If McAfee's illegal options backdating is determined to have

4   violated this consent order, it will result in even greater harm to the Company and its shareholders.

5       22.    Plaintiff has not made a demand on McAfee's board because the acts complained of

6   are illegal, *ultra vires*, and have no legitimate business purpose whatsoever. In addition, at least six

7   of the eight members of McAfee's Board at the time this lawsuit was filed were either interested in

8   the transactions complained of, or were not independent. In particular:

9       •     Samenuk was both Chairman of the Board of Directors and CEO of McAfee. He
10           realized over $23 million from options granted on highly suspect dates. He was directly involved in the options granting process, and was subsequently forced to resign.

11       •     Leslie Denend ("Denend"), is a former President of McAfee and Network General
12           and has deep connections with McAfee's management. He was given a grant of over 1,000,000 shares of McAfee stock on the lowest price of the year in 1998. He is also
13           on the board of Verifone, which has done business with McAfee since 2004. McAfee announced that Denend also received improperly priced options.

14       •     Robert M. Dutkowsky ("Dutkowsky") was on McAfee's Compensation Committee
15           from 2001-2005, during which many option grants at McAfee were backdated. Dutkowsky recently announced that he would be resigning from McAfee's Board no
16           later than January 31, 2007.

17       •     Defendants Liane S. Wilson ("Wilson") and Denis O'Leary ("O'Leary") both
          received mispriced options, which the Company had to reprice, at the same time
18           Wilson and O'Leary were serving on McAfee's Compensation Committee. Defendant Wilson also served on McAfee's Audit Committee since 2002.

19       •     Robert W. Pangia ("Pangia") served on McAfee's Audit Committee and
20           Compensation Committee during the time that the Company has admitted options were improperly grants.

21

22       **ILLEGAL BACKDATING EXPOSED – MCAFEE ADMITS TO MISDATING OPTIONS – WILL RESTATE FINANCIALS FOR FIVE YEARS**

23       23.    On May 16, 2006, the Center for Financial Research and Analysis ("CFRA") issued a

24   report: "Options Backdating – Which Companies Are at Risk?" The report stated that McAfee was

25   among the "higher risk" companies reported to have granted executives stock options at exercise

26   prices and dates that matched exactly or were close to a 40-day low in the Company's stock price

27   during the period of 1997-2004. The report also identified the risks for companies that have taken

28   part in options backdating:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT         - 8 -

1
2

* SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

3
4

* Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

5
6

* Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

7
8
9

* Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

10 On that same day, McAfee's stock dropped as it was mentioned in the CFRA report on companies at

11 risk for being involved in the backdating scandal. On May 22, 2006, reports surfaced of an internal

12 review conducted at McAfee. Then, on May 25, 2006, reports were published that McAfee was in

13 talks with the SEC regarding its stock option practices.

14     24.     On May 30, 2006, the Company announced that it had fired its General Counsel,

15 defendant Roberts, for improper conduct related to stock option grants under investigation:

16
17

McAfee, Inc., today announced that its *Board of Directors has terminated the employment of its General Counsel, Kent Roberts*. The Company had previously disclosed that it is reviewing prior practices in connection with grants of employee stock options.

18
19
20

In connection with that review, *the Company became aware of one episode involving the General Counsel in 2000 that was improper. As a result, the Board has terminated his employment....* The Company has had communications on the subject of option grants with staff of both the Securities and Exchange Commission and the Justice Department.

21     25.     On June 9, 2006, the Company filed a Form 8-K with the SEC stating that its

22 previously disclosed voluntary investigation into the Company's option granting practices and

23 informal discussions with the SEC had advanced to a formal investigation by service of a subpoena

24 on the Company by the SEC.

25     26.     On July 27, 2006, the Company announced that its second quarter 2006 financial

26 results were only preliminary because its investigation, coupled with the SEC investigation, was still

27 ongoing and that it was likely that the Company would have to restate previously reported financial

28 results and that restatement could span several prior periods. In addition, the Company would have

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                  - 9 -

1   to delay filing its financial results for the second quarter of 2006 and that it would restate its

2   financial results for 2003 through 2005, all as a result of its review of its options granting processes:

3                 The second quarter results are preliminary because the Registrant (as previously disclosed) is in the process of reviewing its stock option grant practices

4   and related accounting. *McAfee believes that, as a result of this financial results in at least one, and potentially several, prior periods, to reflect additional stock*

5   *compensation and/or tax related impact.* These adjustments could also affect the preliminary results announced in the furnished July 27, 2006 press release, which are

6   presented without taking into account any adjustments or restatements which may be required resulting from the ongoing review of stock option grants.

7

8                \*     \*     \*

              Because of the pending review, McAfee is not in a position to timely file its

9   Form 10-Q with the SEC for the second quarter ended June 30,2006. McAfee will attempt to file its Form 10-Q as soon as it has sufficient certainty as to the impact of

10   these matters on its financial statements.

11   27.    In a conference call on the same day hosted by McAfee, defendants Samenuk and

12   Brown discussed the expenses associated with the Special Committee's review of the backdating/

13   misdating investigation and confirmed to shareholders that the expenses to the Company "will be

14   significant."

15   *We think that we will indeed incur additional significant cash expenses associated with the ongoing stock option review.* What we have done to date – and it's

16   reflected in the Q2 2006 financials – we've identified a line item labeled SEC and compliance costs. And in that, we include the cost for the ongoing stock option

17   review external costs specifically as well as the pre-existing six-month review, which is being done pursuant to the SEC administrative order. So those expenses will be

18   included as GAAP G&A but excluded from pro forma G&A when you look at our Q3 2006 results.

19

20   28.    In addition, Brown explained that the Company's future earnings guidance "excludes

21   any impact from any non-cash charges that could result from our internal review of stock option

22   grant practices." Thus, the Company has effectively admitted that its past malfeasance will not only

23   require restatement of publicly reported financials for the past five years, but the Company's future

24   earnings will be negatively impacted as well.

25   29.    On August 16, 2006, the Company announced the preliminary findings of its Special

26   Committee delegated responsibility for investigating option grant irregularities at McAfee. The

27   Special Committee confirmed that options granted had been improperly backdated and did not

conform with APB No. 25:

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT              - 10 -

1        *As a result of McAfee's previously announced independent review of its historical stock option grant practices and related accounting, McAfee's Special Committee of independent directors conducting this review has reached the conclusion that*, pursuant to the requirements of Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees (APB 25), *the actual accounting measurement dates for certain historical stock options differ from the measurements dates previously used for such awards.* The Special Committee has not yet completed its review. As a result, the Special Committee has determined that new accounting measurement dates will apply to the affected option grants. *McAfee believes that it is more likely than not that the amount of such additional adjustments relating to prior periods will be material and that McAfee will restate its financial statements in at least one, and potentially several, prior periods.*

2

3

4

5

6

7

8        McAfee's authorized officers, after discussing the matter with its auditors, have concluded that its previously issued financial statements for fiscal years 2005, 2004 and 2003, including 2002 and 2001 data, which are included in the Company's Annual Report on Form 10-K for the year ended December 31, 2005, the Quarterly Reports on Form 10-Q filed with respect to each of these fiscal years and the financial statements included in the Company's Quarterly Report on Form 10Q for the first quarter of fiscal year 2006 should no longer be relied upon. In the event that a restatement of these financial statements is required, it is likely it will affect financial statements for prior periods.

9

10

11

12

                           *   *   *

13

14        McAfee also expects that expenses arising from the Special Committee's review *any potential restatement of financial statements and related activities, which will be recorded in the periods incurred, will be significant.*

15

16       30.   On August 18, 2006, the Company announced that it had received a subpoena from

the U.S. Attorney's Office regarding their termination of defendant Roberts:

17

18        McAfee, Inc. (the "Company") has received a grand jury subpoena from the U.S. Attorney's Office for the Northern District of California relating to the Company's previously disclosed termination of the employment of Kent Roberts, the Company's former general counsel, his options-related activities, and the Company's previously announced investigation. The Company is continuing to fully cooperate with the U.S. Attorney's Office.

19

20

21       31.   On October 11, 2006, the Company announced that, following the Special Committee

22   report on historical stock option grant practices, defendant Samenuk "retired" and defendant Kevin

23   Weiss ("Weiss") was fired:[4]

24

25     [4]    Samenuk, apparently dismissed for his malfeasance or nonfeasance in the backdating scheme, stands to make millions more because of his departure from the Company, which has been cleverly characterized as a "retirement." *See* Samenuk Employment Agreement:

26

27       [I]f Mr. Samenuk is terminated other than for cause or resigns for good reason, he will be entitled to the following severance benefits: (i) all of Mr. Samenuk's shares

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                - 11 -

1    On October 11, 2006, McAfee, Inc. ("McAfee") issued a press release
     announcing that George Samenuk, its Chairman of the Board and Chief Executive
2    Officer, has retired from McAfee, that Kevin Weiss, its President, has been
     terminated by McAfee, that Dale L. Fuller has been appointed as Interim President
3    and Chief Executive Officer, and that Charles J. Robel has been appointed non-
     executive Chairman of the Board. The foregoing personnel actions followed the
4    presentation to the McAfee Board of Directors of the determinations by the Special
     Committee of independent directors regarding the previously announced
5    investigation of McAfee's historical stock option grant practices and related
     accounting.
6
       32.    On the same day, October 11, 2006, McAfee further announced that its review had
7
     concluded that instead of restating only five years of financial statements, the options backdating
8
     scheme would require restatement of ten years of false reported financials:
9
             Following the substantial completion of the Special Committee's previously
10   announced internal review of McAfee's stock option grant practices, conducted with
     the assistance of independent counsel and forensic accountants, McAfee has
11   determined that it will need to restate historical financial statements to record
     additional non-cash charges for stock-based compensation expense *over a ten year*
12   *period. Based on that preliminary review, McAfee announced that it currently*
     *believes that the amount of the restatement required to record such charges is*
13   *likely to be in the range of $100 to 150 million.* McAfee and its independent
     auditors will be reviewing recent guidance released by the Office of the Chief
14   Accountant of the SEC and have not yet conclusively determined the exact amount
     of such charges, the resulting tax and accounting impact, or which specific prior
15   periods require restatement. McAfee intends to file its restated financial results and
     Annual Report on Form 10-K as quickly as practicable.
16
       33.    On December 29, 2006, the Company admitted that the period of the backdating at
17
     McAfee was even longer than had previously been disclosed. While some companies implicated in
18
     the options backdating scandal appear to have ceased backdating when Sarbanes-Oxley went into
19
     effect,[5] McAfee admits that grants to defendants Samenuk and Weiss on May 4, 2004 were misdated
20

21
             of restricted stock, if any, and all stock options will become fully vested and, if
22   applicable, any repurchase rights on his shares will lapse, (ii) eighteen monthly
     severance payments based on twice Mr. Samenuk's monthly base salary and targeted
23   bonus and (iii) eighteen months of continued health and other welfare and fringe
     benefits.
24
     As Samenuk was intimately involved in the backdating of stock options at McAfee, he clearly did
25   not resign "for good cause" and should not escape with even more options through a severance
     agreement.
26
     [5]    Sarbanes-Oxley limited the ability to backdate options because it requires that stock option
27   grants be reported within two business days of the grant. Sarbanes-Oxley Act of 2002, §403, 15
     U.S.C. §78p.
28

1  and required re-pricing. Thus, Dutkowsky, Pangia, Wilson, and O'Leary all approved backdated
2  options while serving on McAfee's Compensation Committee. Defendant, O'Leary also received
3  misdated options on at least three occasions – all of which had to be adjusted to a higher grant price,
4  causing potential losses to O'Leary of over $100,000 to date.

## JURISDICTION AND VENUE

6        34.    The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Securities
7  Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17
8  C.F.R. §240.10b-5, promulgated thereunder, and under California and Delaware law for violations of
9  breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment,
10  gross mismanagement and breach of contract. In connection with the acts, conduct and other wrongs
11  complained of herein, defendants, directly or indirectly, used the means and instrumentalities of
12  interstate commerce, the United States mail and the facilities of a national securities market.

13        35.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15
14  U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the
15  state law claims asserted herein pursuant to 28 U.S.C. §1367.

16        36.    This action is not a collusive one to confer jurisdiction on a court of the United States
17  which it would not otherwise have.

18        37.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa,
19  as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and
20  dissemination of materially false and misleading information, occurred in substantial part in this
21  District. McAfee is located in and conducts its business in this District.

## PARTIES

23        38.    Plaintiff Dennis K. Webb is currently a shareholder of McAfee and has held stock in
24  McAfee continuously since July 22, 1998.

25        39.    Nominal defendant McAfee is a Delaware corporation with its principal executive
26  offices located at 3965 Freedom Circle, Santa Clara, California. McAfee is a worldwide supplier of
27  computer security solutions designed to proactively prevent intrusions on networks and secure
28  computer systems and other digital devices from a large variety of known and unknown threats and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 13 -

1 attacks. The Company develops, markets, distributes and supports computer security solutions for
2 large enterprises, governments, small and medium-sized business and consumers through a network
3 of qualified partners.

4     40.   While incorporated in Delaware, McAfee's business is operated from California
5 where it employs thousands of employees, sponsors numerous sporting and civic events, and owns
6 several plants and facilities. By contrast, the Company has few, if any major business operations
7 located in Delaware. During the Relevant Period, McAfee had more than 500 record shareholders of
8 its common stock.

9     41.   Defendant Samenuk was, at times relevant hereto, President, Chairman of the Board
10 of Directors, and CEO of McAfee. Because of Samenuk's positions, he knew the adverse non-
11 public information about the business of McAfee, as well as its finances, markets and present and
12 future business prospects, via access to internal corporate documents, conversations and connections
13 with other corporate officers and employees, attendance at management and Board meetings and
14 committees thereof and via reports and other information provided to him in connection therewith.
15 During the Relevant Period, Samenuk participated in the issuance of false and/or misleading
16 statements, including the preparation of the false and/or misleading press releases and SEC filings.
17 Samenuk signed the Form 10-Ks for every year since 2001 and Sarbanes-Oxley certifications since
18 2003. Additionally, Samenuk's signature was required for the options grants to the highest level
19 executives. Samenuk also decided the total number of options to be distributed by the various
20 department vice presidents. On October 11, 2006, McAfee announced that Samenuk had "retired"
21 from McAfee following the Special Committee's presentation of the their investigation of McAfee's
22 historical stock option grant practices and related accounting. During the Relevant Period, McAfee
23 paid defendant Samenuk the following amounts in salary, bonus and option grants:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2001 | $714,922 | $540,000 | 1,200,000 |
| 2002 | $720,000 | $900,000 | 470,000 |
| 2003 | $720,000 | $870,000 | 400,000 |
| 2004 | $773,333 | $1,075,000 | 300,000 |
| 2005 | $835,224 | $1,000,000 | 250,000 |

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT      - 14 -

1 ‖ Samenuk exercised options for 1,335,000 shares of McAfee stock, and sold the shares for profits of
2 ‖ $33.5 million during the Relevant Period. He also sold 75,000 option shares of stock acquired at
3 ‖ $.01 per share for $1,875,000.

4 ‖     42.     Defendant Richards was, at times relevant hereto, CFO, COO, and Executive Vice
5 ‖ President ("EVP") of McAfee. Because of Richards' positions, he knew the adverse non-public
6 ‖ information about the business of McAfee, as well as its finances, markets and present and future
7 ‖ business prospects, via access to internal corporate documents, conversations and connections with
8 ‖ other corporate officers and employees, attendance at management meetings and via reports and
9 ‖ other information provided to him in connection therewith. Defendant Richards, by his specialized
10 ‖ financial expertise, was in a unique position to understand the business of McAfee, as well as its
11 ‖ finances, markets and present and future business prospects. During the Relevant Period, Richards
12 ‖ participated in the issuance of false and/or misleading statements, including the preparation of the
13 ‖ false and/or misleading press releases and SEC filings. Richards signed the Form 10-Ks for 2002
14 ‖ and 2003 and a Sarbanes-Oxley certification in 2003. Additionally, Richards' signature was
15 ‖ required for approval of all option grants in the Finance Department up to the level of vice president.
16 ‖ McAfee paid defendant Richards the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2001 | $259,807 | $175,000 | 650,000 |
| 2002 | $349,999 | $455,000 | 100,000 |
| 2003 | $387,500 | $402,344 | 150,000 |
| 2004 | $412,500 | $384,688 | 150,000 |

Richards exercised options for 350,000 shares of McAfee stock, selling the shares for profits of $4.5
million during the Relevant Period. He also sold 50,000 shares of stock acquired at $.01 per share
for proceeds of $1.2 million.

    43.     Defendant Weiss was, at times relevant hereto, the President and EVP of Worldwide
Sales of McAfee. Because of Weiss's position, he knew the adverse non-public information about
the business of McAfee, as well as its finances, markets and present and future business prospects,
via access to internal corporate documents, conversations and connections with other corporate
officers and employees, attendance at management meetings and via reports and other information

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT     - 15 -

1  provided to him in connection therewith. On October 11, 2006, McAfee announced that Weiss had

2  been fired from McAfee following the Special Committee's presentation of their investigation of

3  McAfee's historical stock option grant practices and related accounting. During the Relevant Period,

4  Weiss participated in the issuance of false and/or misleading statements, including the preparation of

5  the false and/or misleading press releases and SEC filings. During the Relevant Period, McAfee

6  paid defendant Weiss the following amounts in salary and bonuses:

| Year  | Salary    | Bonus     | Options |
|-------|-----------|-----------|---------|
| 2002[6] | $68,958   | $56,520   | 250,000 |
| 2003  | $350,000  | $241,563  | 200,000 |
| 2004  | $441,667  | $463,750  | 100,000 |
| 2005  | $483,811  | $448,195  | 100,000 |

Weiss sold 150,000 shares of McAfee stock for proceeds of $4.2 million during the Relevant Period.

44.    Defendant Roberts was, at times relevant hereto, EVP and General Counsel of McAfee. Because of Roberts' positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Roberts participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Roberts signed every false Proxy Statement by order of the Board since 2001, including the Proxy Statement filed on May 25, 2006, just six days before he was fired. McAfee paid Roberts the following amounts in salary and bonuses:

| Year  | Salary    | Bonus     | Options |
|-------|-----------|-----------|---------|
| 2000  | $153,529  | $46,500   | 30,000  |
| 2001  | $229,166  | $99,147   | 150,000 |
| 2002  | $282,765  | $164,375  | 100,000 |
| 2003  | $300,000  | $157,500  | 75,000  |
| 2004  | $333,333  | $170,938  | 75,000  |
| 2005  | $364,090  | $199,800  | 55,000  |

_____

6     Weiss began working at McAfee in October 2002.

1  Roberts exercised options for 270,416 shares of McAfee stock for proceeds of $4.0 million during
2  the Relevant Period. On February 27, 2007, Roberts was indicted by a federal grand jury on fraud
3  charges related to stock option backdating at McAfee.

4      45.     Defendant Hodges was, at times relevant hereto, President of McAfee and of the
5  McAfee Product Group. Because of Hodges' position, he knew the adverse non-public information
6  about the business of McAfee, as well as its finances, markets and present and future business
7  prospects, via access to internal corporate documents, conversations and connections with other
8  corporate officers and employees, attendance at management meeting via reports and other
9  information provided to him in connection therewith.  During the Relevant Period, Hodges
10  participated in the issuance of false and/or misleading statements, including the preparation of the
11  false and/or misleading press releases and SEC filings. McAfee paid Hodges the following amounts
12  in salary, bonuses and options:

| Year | Salary    | Bonus     | Options |
|------|-----------|-----------|---------|
| 2000 | $205,295  | $58,527   | 0       |
| 2001 | $290,000  | $108,596  | 600,000 |
| 2002 | $375,000  | $445,312  | 0       |
| 2003 | $412,500  | $345,469  | 150,000 |
| 2004 | $445,833  | $451,250  | 150,000 |
| 2005 | $506,531  | $420,000  | 125,000 |

18  Hodges exercised options for 606,457 shares of McAfee stock for proceeds of $10.3 million during
19  the Relevant Period.

20      46.     Defendant Brown became McAfee's CFO and COO on January 3, 2005, when
21  Richards retired. Because of Brown's positions, he knew the adverse non-public information about
22  the business of McAfee, as well as its finances, markets and present and future business prospects,
23  via access to internal corporate documents, conversations and connections with other corporate
24  officers and employees, attendance at management meetings via reports and other information
25  provided to him in connection therewith. During the Relevant Period, Brown participated in the
26  issuance of false and/or misleading statements, including the preparation of the false and/or
27  misleading press releases and SEC filings. In 1998, McAfee paid Brown the following amounts in
28  salary, bonuses and options:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 17 -

1

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1998 | $1,051,921 | $178,850 | 240,000 |

2

3  Brown sold 581,829 shares of McAfee stock for proceeds of $15.9 million during the Relevant

4  Period.

5      47.    Defendant Denend is, and at all times relevant hereto was, a director of McAfee.

6  Defendant Denend served on the Company's Audit Committee, responsible for the Company's audit

7  practices during 1998.    Denend also served on the Company's Compensation Committee,

8  responsible for approving stock option grants between 1995-1997.  Denend was also President of

9  McAfee from December 1, 1997 until April 30, 1998.  Because of Denend's position, he knew the

10  adverse non-public information about the business of McAfee, as well as its finances, markets and

11  present and future business prospects, via access to internal corporate documents, conversations and

12  connections with other corporate officers and employees, attendance at Board meetings and

13  committees thereof and via reports and other information provided to him in connection therewith.

14  Denend has signed every Form 10-K during the Relevant Period.  During the Relevant Period,

15  Denend participated in the issuance of false and/or misleading statements, including the preparation

16  of the false and/or misleading press releases and SEC filings. In 1998, McAfee paid Denend the

17  following amounts in salary, bonuses and options:

18

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1998 | $1,051,921 | $178,850 | 240,000 |

19

20  Denend exercised 496,592 shares of McAfee stock for proceeds of $8.3 million during the Relevant

   Period.

21

22      48.    Defendant Garcia-Lechelt was, at times relevant hereto, Manager and/or Director of

23  Human Resources and subsequently Senior Vice President, Worldwide Human Resources of

   McAfee.  Garcia-Lechelt is also a member of McAfee's Ethics First Committee which was supposed

24  to investigate allegation of unethical behavior at McAfee. Garcia-Lechelt was responsible for

25  creating some of the Personnel Action Forms ("PAFs") required to make option grants to senior

26  level executives at McAfee. From at least 2001 until 2003, Garcia-Lechelt participated directly with

27  Samenuk to determine how many options would be given to senior level executives. Beginning in at

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 18 -

1 | least 2004, Garcia-Lechelt was a member of McAfee's SPAC, together with defendants Roberts and
2 | Brown. The SPAC would approve option grants for senior management at McAfee. In these
3 | capacities, Garcia-Lechelt was directly involved in the backdating of stock options to McAfee senior
4 | management.

5 |     49.    Defendant Evan S. Collins ("Collins") was, at times relevant hereto, Finance Director
6 | and Corporate Controller of McAfee. Starting in July 1999, he was the VP, CFO and Secretary of
7 | McAfee.com Corporation, a majority-owned subsidiary of McAfee. Because of Collins' positions,
8 | he knew the adverse non-public information about the business of McAfee, as well as its finances,
9 | markets and present and future business prospects, via access to internal corporate documents,
10 | conversations and connections with other corporate officers and employees, attendance at
11 | management meetings and via reports and other information provided to him in connection
12 | therewith. Defendant Collins, by his specialized financial expertise, was in a unique position to
13 | understand the business of McAfee, as well as its finances, markets and present and future business
14 | prospects. During the Relevant Period, Collins participated in the issuance of false and/or
15 | misleading statements, including the preparation of the false and/or misleading press releases and
16 | SEC filings. Collins signed the false Proxy Statement by order of the Board in 2000. Collins was
17 | responsible for signing some of the PAFs required to make option grants to employees. From
18 | sometime in 1997 or 1998 through at least mid-1999, Collins was in charge of stock administration.
19 | In 1999, Collins received a grant of 10,000 options, dated April 20, 1999, with an exercise price of
20 | $11.0625. Collins also had at least 20,000 options "repriced," dated for April 22, 1999, with an
21 | exercise price of $11.0625. Collins exercised 30,000 options, on or about November 1, 2000, paying
22 | $11.0625 for each share and selling the shares for $19.50. Collins thus gained a profit of $253,125
23 | for these shares. He was later charged with securities fraud, including illegal insider trading. On
24 | November 30, 2004, Collins entered into a consent decree with the SEC, agreeing to disgorge these
25 | profits and all interest earned thereon.

26 |     50.    Defendant Larson was, at times relevant hereto, CEO and Chairman of the Board of
27 | Directors, and special advisor to, McAfee. Because of Larson's positions, he knew the adverse non-
28 | public information about the business of McAfee, as well as its finances, markets and present and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT         - 19 -

1  future business prospects, via access to internal corporate documents, conversations and connections

2  with other corporate officers and employees, attendance at management meetings and via reports and

3  other information provided to him in connection therewith. Defendant Larson, by his specialized

4  financial expertise, was in a unique position to understand the business of McAfee, as well as its

5  finances, markets and present and future business prospects. During the Relevant Period, Larson

6  participated in the issuance of false and/or misleading statements, including the preparation of the

7  false and/or misleading press releases and SEC filings. Larson ordered the signing of all Proxy

8  Statements between 1996 and 2000, and signed the Form 10-Ks for the same years. McAfee paid

9  defendant Larson the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $248,260 | $151,044 | -- |
| 1997 | $286,268 | $279,600 | 800,000 |
| 1998 | $419,962 | $453,775 | 300,000 |
| 1999 | $420,000 | $366,275 | -- |
| 2000 | $420,000 | $566,266 | -- |

14  During the Relevant Period, Larson exercised over 2.5 million options, selling the shares of McAfee

15  stock for proceeds of $82.3 million.

16      51.      Defendant Cline was, at times relevant hereto, VP of International Sales and VP of

17  Worldwide Sales of McAfee. Because of Cline's positions, he knew the adverse non-public

18  information about the business of McAfee, as well as its finances, markets and present and future

19  business prospects, via access to internal corporate documents, conversations and connections with

20  other corporate officers and employees, attendance at management meetings and via reports and

21  other information provided to him in connection therewith. During the Relevant Period, Cline was

22  one of the managers who typically signed off on the PAFs. Cline also sold 253,000 shares of

23  McAfee stock for $7.8 million. McAfee paid defendant Cline the following amounts in salary,

24  bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $109,503 | $99,100 | 75,000 |
| 1997 | $175,007 | $103,865 | 200,000 |

52. Defendant Nelson was, at times relevant hereto, EVP and General Manager of Worldwide Marketing and Alliances and Chief Strategy Officer of McAfee, and President and CEO of MyCIO.com. Because of Nelson's positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Nelson was one of the individuals responsible for signing PAFs. McAfee paid defendant Nelson the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1998 | $300,313 | $147,714 | 225,000 |
| 1999 | $300,313 | $156,434 | 200,000 |
| 2000 | $225,009 | $137,955 | -- |
| 2001 | $250,210 | $130,000 | 400,000 |

Nelson exercised 126,000 options of McAfee stock for proceeds of $1.5 million during the Relevant Period.

53. Defendant Watkins was, at times relevant hereto, President, COO, EVP and General Manager Net Tools Secure, Vice President and General Manager of Total Virus and Defense Division of McAfee. Because of Watkins' positions, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. McAfee paid defendant Watkins the following amounts in salary, bonus and options:

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $144,488 | $87,358 | 84,375 |
| 1997 | $191,289 | $66,577 | 300,000 |
| 1998 | $299,628 | $130,260 | 225,000 |
| 1999 | $300,312 | $167,988 | 100,000 |
| 2000 | $204,167 | $90,430 | 500,000 |
| 2001 | $250,210 | $130,000 | 400,000 |

Watkins sold McAfee stock for proceeds of $18.5 million during the Relevant Period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 21 -

1    54.    Defendant Matin was, at times relevant hereto, President of McAfee Product Group
2  and President of McAfee Security. Because of Matin's positions, he knew the adverse non-public
3  information about the business of McAfee, as well as its finances, markets and present and future
4  business prospects, via access to internal corporate documents, conversations and connections with
5  other corporate officers and employees, attendance at management meetings and via reports and
6  other information provided to him in connection therewith. McAfee paid defendant Matin the
7  following amounts in salary, bonus and options:

8
9
10

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 2001 | $53,077 (reflecting a 10/30/01 start date) | -- | 600,000 |
| 2002 | $400,000 | $249,062 | 150,000 |
| 2003 | $400,000 | $311,750 | 35,000 |

11
Matin sold McAfee stock for proceeds of almost $2 million during the Relevant Period.

12
13
14
15
16
17
18
19
20
21
22
23
24

55.    Defendant Goyal was, at times relevant hereto, CFO, VP of Finance and
Administration, Treasurer and Secretary of, and special advisor to, McAfee. Because of Goyal's
positions, he knew the adverse non-public information about the business of McAfee, as well as its
finances, markets and present and future business prospects, via access to internal corporate
documents, conversations and connections with other corporate officers and employees, attendance
at management meetings and via reports and other information provided to him in connection
therewith. Defendant Goyal, by his specialized financial expertise, was in a unique position to
understand the business of McAfee, as well as its finances, markets and present and future business
prospects. During the Relevant Period, Goyal participated in the issuance of false and/or misleading
statements, including the preparation of the false and/or misleading press releases and SEC filings.
Goyal signed the false Proxy Statements by order of the Board in 1997, 1998 and 1999.
Additionally, Goyal's signature was required for PAFs granting options to employees. McAfee paid
defendant Goyal the following amounts in salary, bonus and options:

25
26
27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                - 22 -

| Year | Salary | Bonus | Options |
|------|--------|-------|---------|
| 1996 | $111,591 | $45,858 | 300,000 |
| 1997 | $188,469 | $94,913 | 200,000 |
| 1998 | $300,013 | $134,107 | 225,000 |
| 1999 | $300,013 | $136,313 | 100,000 |
| 2000 | $300,013 | $190,250 | -- |

Goyal exercised 218,125 options McAfee stock for proceeds of $5.7 million during the Relevant Period.

56.     Defendant Dutkowsky was, at times relevant hereto, a director of McAfee. Defendant Dutkowsky served on the Company's Audit Committee, responsible for the Company's audit practices between 2002-2005. Dutkowsky also served on the Company's Compensation Committee, responsible for approving stock option grants between 2001-2005. Because of Dutkowsky's position, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Dutkowsky participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Dutkowsky signed the Form 10-Ks and ordered the signing of the Proxy Statements for every year since 2001. As a member of the Audit Committee, defendant Dutkowsky caused or allowed the dissemination of the improper public statements described herein. On October 4, 2006, McAfee announced that Dutkowsky intended to resign from the Board by no later than January 31, 2007.

57.     Defendant O'Leary is, and was at times relevant hereto, a director of McAfee. Defendant O'Leary also served on the Company's Compensation Committee, responsible for the approval of stock option grants from 2002-2005. Because of O'Leary's position, he knew the adverse non-public information about the business of McAfee, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 23 -

1  As a member of the Compensation Committee, defendant O'Leary controlled the other defendants'
2  stock option awards. During the Relevant Period, O'Leary participated in the issuance of false
3  and/or misleading statements, including the preparation of the false and/or misleading press releases
4  and SEC filings. O'Leary signed the Form 10-Ks and ordered the signing of the Proxy Statements
5  for every year since 2003.

6       58.     Defendant Pangia was, at times relevant hereto, a director of McAfee. Defendant
7  Pangia also served on the Company's Compensation Committee, responsible for approving stock
8  option grants between 2002-2005. Defendant Pangia also served on the Company's Audit
9  Committee, responsible for the Company's audit practices between 2001-2005. Pangia was a
10 signatory on Form 10-Ks filed with the SEC during the Relevant Period. Because of Pangia's
11 position, he knew the adverse non-public information about the business of McAfee, as well as its
12 finances, markets and present and future business prospects, via access to internal corporate
13 documents, conversations and connections with other corporate officers and employees, attendance
14 at Board meetings and committees thereof and via reports and other information provided to him in
15 connection therewith. During the Relevant Period, Pangia participated in the issuance of false and/or
16 misleading statements, including the preparation of the false and/or misleading press releases and
17 SEC filings. Pangia signed the Form 10-Ks and ordered the signing of the Proxy Statements for
18 every year since 2001. As a member of the Audit Committee, defendant Pangia caused or allowed
19 the dissemination of the improper public statements described herein.

20      59.     Defendant Robert B. Bucknam ("Bucknam") is, and at times relevant hereto was, a
21 director of McAfee. Because of Bucknam's position, he knew the adverse non-public information
22 about the business of McAfee, as well as its finances, markets and present and future business
23 prospects, via access to internal corporate documents, conversations and connections with other
24 corporate officers and employees, attendance at Board meetings and committees thereof and via
25 reports and other information provided to him in connection therewith. During the Relevant Period,
26 Bucknam participated in the issuance of false and/or misleading statements, including the
27 preparation of the false and/or misleading press releases and SEC filings. Bucknam signed the Form
28 10-Ks and ordered the signing of the Proxy Statements for every year since 2003.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 24 -

1    60.    Defendant Dale L. Fuller ("Fuller") was, at times relevant hereto, a director of
2  McAfee. Fuller is currently interim CEO and President of McAfee. Because of Fuller's position, he
3  knew the adverse non-public information about the business of McAfee, as well as its finances,
4  markets and present and future business prospects, via access to internal corporate documents,
5  conversations and connections with other corporate officers and employees, attendance at Board
6  meetings and committees thereof and via reports and other information provided to him in
7  connection therewith. During the Relevant Period, Fuller participated in the issuance of false and/or
8  misleading statements, including the preparation of the false and/or misleading press releases and
9  SEC filings. Fuller signed the Form 10-Ks and ordered the signing of the Proxy Statements for
10  every year since 2006.

11    61.    Defendant Wilson is, and at times relevant hereto was, a director of McAfee.
12  Defendant Wilson also served on the Company's Audit Committee, responsible for the Company's
13  audit practices between 2002-2005. Defendant Wilson also served on the Company's Compensation
14  Committee, responsible for approving stock option grants between 2002-2003. Because of Wilson's
15  position, she knew the adverse non-public information about the business of McAfee, as well as its
16  finances, markets and present and future business prospects, via access to internal corporate
17  documents, conversations and connections with other corporate officers and employees, attendance
18  at Board meetings and committees thereof and via reports and other information provided to her in
19  connection therewith. During the Relevant Period, Wilson participated in the issuance of false
20  and/or misleading statements, including the preparation of the false and/or misleading press releases
21  and SEC filings. Wilson signed the Form 10-Ks and ordered the signing of the Proxy Statements for
22  every year since 2002.

23    62.    Defendant Virginia Gemmell ("Gemmell") was, at times relevant hereto, a member of
24  the Company's Board and served on the Company's Compensation Committee responsible for
25  reviewing and approving stock option grants between 1996 and 2001. Because of Gemmell's
26  position, she knew the adverse non-public information about the business of McAfee, as well as its
27  finances, markets and present and future business prospects, via access to internal corporate
28  documents, conversations and connections with other corporate officers and employees, attendance

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 25 -

1   at management meetings and via reports and other information provided to him in connection

2   therewith. During the Relevant Period, Gemmell participated in the issuance of false and/or

3   misleading statements, including the preparation of the false and/or misleading press releases and

4   SEC filings and signed the Form 10-Ks during the Relevant Period.

5           63.     Defendant Edwin Harper ("Harper") was at times during the relevant period a

6   member of the Company's Board and served on the Company's Audit Committee responsible for the

7   Company's accounting practices between 1995 and 2001. Harper also served on the Company's

8   Compensation Committee responsible for reviewing and approving stock option grants between

9   1997 and 2001. Because of Harper's position, he knew the adverse non-public information about the

10   business of McAfee, as well as its finances, markets and present and future business prospects, via

11   access to internal corporate documents, conversations and connections with other corporate officers

12   and employees, attendance at management meetings and via reports and other information provided

13   to him in connection therewith. During the Relevant Period, Harper participated in the issuance of

14   false and/or misleading statements, including the preparation of SEC filings and signed the Form

15   10-Ks during the Relevant Period.

16           64.     The charts below illustrate the members of both the Audit Committee and the

17   Compensation Committee during the Relevant Period.

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| McAfee, Inc. Audit Committee (At Issuance of Annual Proxy) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Director Name | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Chambers | M | | | | | | | | | | |
| Harper | M | M | M | M | M | M | | | | | |
| Kortschak | M | | | | | | | | | | |
| Bolger | | M | | | | | | | | | |
| Saal | | | M | | | | | | | | |
| *Denend | | | | M | | | | | | | |
| Gemmell | | | | | M | M | | | | | |
| Torresi | | | | | M | | | | | | |
| *Pangia | | | | | | M | M | M | M | M | M |
| *Wilson | | | | | | | M | M | M | M | M |
| *Dutkowsky | | | | | | | M | M | M | M | M |

M = Member; C= Chairman of Committee; *= Board Member as of April 2006
*Effective April 30, 1998, Mr. Bolger resigned from the Board of Directors.
*Mr. Denend joined the committee on April 30, 1998.
*Mr. Torresi was added to the committee in March 2000.
*Mr. Pangia was added to the committee in April 2001.
*Ms. Wilson and Mr. Dutkowsky were added to the committee in April 2002.

| McAfee, Inc. Compensation Committee (At Issuance of Annual Proxy) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Director Name | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Chambers | M | | | | | | | | | | |
| *Denend | M | M | | | | | M | | | | |
| Kortschak | M | | | | | | | | | | |
| Gemmell | | M | M | M | M | M | | | | | |
| Harper | | | M | M | M | M | | | | | |
| *Dutkowsky | | | | | | M | M | M | M | M | M |
| *Pangia | | | | | | | M | M | M | M | M |
| *O'Leary | | | | | | | | M | M | M | M |

M = Member; C= Chairman of Committee; *= Board Member as of April 2006
*Mr. Dutkowsky joined the committee in April 2001.
*Mr. Denend and Mr. Pangia joined (and rejoined) the committee in April 2002.
*Ms. Wilson and Pangia joined the committee in 2002. In July 2003, Ms. Wilson resigned from the committee and Mr. O'Leary joined.

## DEFENDANTS WERE CONTROL PERSONS WITH FIDUCIARY DUTIES TO MCAFEE

65.     Each officer and director of McAfee named herein owed the Company and McAfee shareholders the duty to exercise the highest degree of good faith, honesty, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of McAfee's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of McAfee. Furthermore, the misconduct of McAfee's officers has been ratified by McAfee's Board, which enabled defendants to backdate stock options to themselves and their colleagues, as well as refused to take any legal action on behalf of the Company against defendants.

66.     By reason of their positions as officers, directors and fiduciaries of McAfee and because of their ability to control the business and corporate affairs of the Company, defendants owed McAfee and its shareholders fiduciary obligations of good faith, honesty and loyalty, and were required to use their ability to control and manage McAfee in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of McAfee so as to benefit McAfee and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held Company, defendants had a duty to refrain from utilizing their control over McAfee to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

67.     Because of their positions of control and authority as directors or officers of McAfee, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. Because of their positions with McAfee, each of the defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately but failed to do so.

68.     Between 1996 and 2005, defendants repeated in Proxy Statements that the stock option grants made during that period carried an exercise price that was *not less than* the fair market value of McAfee stock on the date granted, as calculated by the public trading price of the stock at

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                          - 28 -

1 the market's close on that date. However, defendants concealed until 2006 that the stock option

2 grants were repeatedly and consciously *backdated* to ensure that the strike price associated with the

3 option grants was at or near the lowest trading price for that fiscal period. Due to defendants'

4 breaches of their fiduciary duties in the administration of the Stock Option Plans, plaintiff seeks to

5 have the directors' and officers' plans voided and gains from those plans returned to the Company.

6 In the alternative, plaintiff seeks to have all of the unexercised options granted to defendants

7 cancelled, the financial gains obtained via the exercise of such options returned to the Company and

8 to have defendants revise the Company's financial statements to reflect the truth concerning these

9 option grants.

10        69.     To discharge their duties, McAfee's officers and directors were required to exercise

11 reasonable and prudent supervision over the management, policies, practices and controls of the

12 business and financial affairs of the Company. By virtue of such duties, the officers and directors of

13 McAfee were required, among other things, to:

14         (a)     Manage, conduct, supervise and direct the business affairs of McAfee in

15 accordance with all applicable law (including federal and state laws, government rules and

16 regulations and the charter and bylaws of McAfee);

17         (b)     Neither engage in self-dealing nor knowingly permit any officer, director or

18 employee of McAfee to engage in self-dealing;

19         (c)     Neither violate nor knowingly permit any officer, director or employee of

20 McAfee to violate applicable laws, rules and regulations;

21         (d)     Remain informed as to the status of McAfee's operations, including its

22 practices in relation to the cost of allowing the pervasive backdating and improperly accounting for

23 such, and upon receipt of notice or information of imprudent or unsound practices, to make a

24 reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices

25 and make such disclosures as are necessary to comply with the U.S. federal securities laws and their

26 duty of candor to the Company's shareholders;

27         (e)     Prudently protect the Company's assets, including taking all necessary steps

28 to recover corporate assets (cash, stock options) improperly paid to Company executives and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT           - 29 -

1  directors together with the related costs (professional fees) proximately caused by the illegal conduct
2  described herein;

3       (f)      Establish and maintain systematic and accurate records and reports of the
4  business and affairs of McAfee and procedures for the reporting of the business and affairs to the
5  Board and to periodically investigate, or cause independent investigation to be made of, said reports
6  and records;

7       (g)      Maintain and implement an adequate, functioning system of internal legal,
8  financial and accounting controls, such that McAfee's financial statements — including its expenses,
9  accounting for stock option grants and other financial information — would be accurate and the
10 actions of its directors would be in accordance with all applicable laws;

11      (h)      Exercise control and supervision over McAfee's public reports and trading in
12 McAfee stock by the officers and employees of McAfee; and

13      (i)      Supervise the preparation and filing of any financial reports or other
14 information required by law from McAfee and to examine and evaluate any reports of examinations,
15 audits or other financial information concerning the financial affairs of McAfee and to make full and
16 accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set
17 forth above.

18      70.      Each defendant, by virtue of his or her position as a director and/or officer, owed to
19 the Company the fiduciary duties of loyalty, good faith and the exercise and diligence in the
20 management and administration of the affairs of the Company, as well as in the use and preservation
21 of its property and assets. The conduct of the defendants complained of herein involves a knowing
22 and culpable violation of their obligations as directors and/or officers of McAfee, the absence of
23 good faith on their part, and a reckless disregard for their duties to the Company and its shareholders
24 which defendants were aware or should have been aware posed a risk of serious injury to the
25 Company. The conduct of the defendants who were also officers and/or directors of the Company
26 during the Relevant Period has been ratified by the Defendants who comprised McAfee's entire
27 Board during the Relevant Period.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                     - 30 -

1      71.    Defendants breached their duties of loyalty and good faith by allowing or by

2 themselves causing the Company to misrepresent its financial results and prospects, as detailed

3 herein *infra*, and by failing to prevent the defendants from taking such illegal actions. In addition, as

4 a result of defendants' illegal actions and course of conduct during the Relevant Period, the

5 Company is now the subject of an SEC investigation into the Company's prior option granting

6 practices. As a result, McAfee has expended and will continue to expend significant sums of money.

7 Such expenditures include, but are not limited to:

8          (a)    Improvidently paid executive compensation;

9          (b)    Increased capital costs as a result of the loss of market capitalization and the

10 Company's damaged reputation in the investment community;

11         (c)    Costs incurred to carry out internal investigations, including legal fees paid to

12 outside counsel; and

13         (d)    Incurring possible IRS penalties for improperly reporting compensation.

14      72.    Through their fiduciary duties of good faith, honesty and loyalty, defendants owed to

15 McAfee a duty to ensure that the Company's financial reporting fairly presented, in all material

16 respects, the operations and financial condition of the Company. In order to adequately carry out

17 these duties, it is necessary for the defendants to know and understand the material non-public

18 information to be either disclosed or omitted from the Company's public statements. This material

19 non-public information included the problems McAfee faced because of its deficient internal

20 controls. Furthermore, all of the members of the Audit Committee during the Relevant Period, had a

21 special duty to know and understand this material information as set out in the Audit Committee's

22 charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with

23 management, the Company's policies generally with respect to the Company's earnings press

24 releases and with respect to financial information and earnings guidance provided to analysts and

25 rating agencies. Defendants who were officers of McAfee during the Relevant Period had ample

26 opportunity to discuss this material information with their fellow officers at management meetings

27 and via internal corporate documents and reports. Moreover, defendants who were directors of

28 McAfee had ample opportunity to discuss this material information with fellow directors at any of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT           - 31 -

1 the scores of Board meetings that occurred during the Relevant Period as well as at committee
2 meetings of the Board. Despite these duties, defendants negligently, recklessly, and/or intentionally
3 caused or allowed, by their actions or inactions, the misleading statements to be disseminated by
4 McAfee to the investing public and the Company's shareholders during the Relevant Period.

5        73.    These actions have irreparably damaged McAfee's corporate image and goodwill.
6 For at least the foreseeable future, McAfee will suffer from what is known as the "liar's discount," a
7 term applied to the stocks of companies who have been implicated in illegal behavior and have
8 misled the investing public, such that McAfee's ability to raise equity capital or debt on favorable
9 terms in the future is now impaired.

10                      **AIDING AND ABETTING AND CONCERTED ACTION**

11        74.    In committing the wrongful acts alleged herein, defendants have pursued or joined in
12 the pursuit of a common course of conduct and acted in concert with one another in furtherance of
13 their common plan. The purpose and effect of defendants' common course of conduct was, among
14 other things, to disguise defendants' violations of law, breaches of fiduciary duty, abuse of control,
15 gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information
16 concerning the Company's operation and financial condition and to artificially inflate the price of
17 McAfee common stock so they could dispose of millions of dollars of their own McAfee stock, and
18 enhance their executive and directorial positions and receive the substantial compensation they
19 obtained as a result thereof.

20        75.    Defendants accomplished their common enterprise and/or common course of conduct
21 by causing the Company to purposefully and/or recklessly engage in the options backdating scheme
22 alleged herein and misrepresent McAfee's financial results. Each of the defendants was a direct,
23 necessary, and substantial participant in the common enterprise and/or common course of conduct
24 complained of herein.

25        76.    Each of the defendants aided and abetted and rendered substantial assistance in the
26 wrongs complained of herein. In taking such actions to substantially assist the commission of the
27 wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing,
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT             - 32 -

1  substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall
2  contribution to and furtherance of the wrongdoing.

3                                   **FACTUAL ALLEGATIONS**

4          77.     McAfee is a worldwide supplier of computer security solutions designed to
5.  proactively prevent intrusions on networks and secure computer systems and other digital devices
6  from a large variety of known and unknown threats and attacks. The Company develops, markets,
7  distributes and supports computer security solutions for large enterprises, governments, small and
8  medium-sized business and consumers through a network of qualified partners.

9          78.     In the mid-1990s, as the internet took off and the need for online security exploded,
10  McAfee grew dramatically. Its net revenues increased from \$21 million in 1992 (the year it went
11  public) to \$990 million in 1998, ultimately peaking in 2001 at well over a billion dollars. Similarly,
12  its employee base grew from 40 employees in 1993 to 1,530 in 1998 and over 3,000 in 2003. This
13  explosion in growth caused increasing demand for "the very limited number of skilled and
14  experienced employees." Therefore, according to the Board, granting stock options was "critical in
15  attracting and retaining these key contributors."

16          79.     A stock option is the right to purchase a share of stock at a set price, called the
17  "exercise price" on a future date after the option vests. Thus, the lower exercise price, the better for
18  the recipient of the option. An option is "in the money" when the trading price is higher than the
19  option's exercise price. The option is "at the money" when the trading price is equal to the exercise
20  price, and the option is "underwater" or "out of the money" when trading at a price lower than the
21  exercise price.

22          80.     In 1997, in a Proxy Statement signed by order of the Board, the Board sought to have
23  a new Stock Incentive Plan (the "1997 Plan") approved by the shareholders. The Board, in seeking
24  shareholder approval, explained its purpose for granting stock options: "[S]tock options and other
25  forms of stock compensation serve to align the long-term interests of the plan's participants and the
26  stockholders and are an important factor in attracting, motivating and retaining qualified personnel
27  essential to the success of the Company."

28          81.     The Board went on to say:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 33 -

1    The Incentive Plan is intended to offer a significant incentive by enabling key
     employees to acquire options to purchase Common Stock at a price equal to its fair
2    market value on the date the option is granted. *The options will become valuable to*
     *the recipients only if the price of the Company's Common Stock appreciates*
3    *following the grant* and when such options have vested. By providing key
     employees with the opportunity to acquire an equity interest in the Company over
4    time and because *a benefit is only received through improved stock performance*,
     the Company believes that stock options serve to align the interests of key employees
5    closely with other stockholders.

6  McAfee shareholders approved the 1997 Plan on June 5, 1997. This plan was effective throughout

7  the remainder of the Relevant Period.

8         82.    According to McAfee's Report on Form 10-K for 1997 signed by Larson, Denend,

9  Goyal, John Bolger ("Bolger"), Gemmell, Harper and Harry Saal ("Saal"), one purpose of adopting

10  the 1997 Plan was to:

11         [E]liminate the ability of the Company's Board of Directors (the "Board") to grant
           options thereunder with an exercise price less than the fair market value of the
12         Company's Common Stock on the date of grant.

13        83.    According to its terms, under the 1997 Plan, incentive stock options granted under the

14  1997 Plan were required to have an exercise price of "[no] less than 100% of the Fair Market Value

15  of a Common Share on the date of the grant." The Company proxies stated that the Fair Market

16  Value was what the market price determined, whenever possible, "based on the prices reported in

17  *The Wall Street Journal*." Throughout the Relevant Period, McAfee represented (falsely) in Proxy

18  Statements that "all options were granted at an exercise price equal to the fair market value of the

19  Common Stock on the date of the grant." However, during the Relevant Period, McAfee's options

20  granted to its employees and highest paid executives had exercise prices lower than the fair market

21  value on the day the grants were actually made.

22        84.    Up until at least 2003, all option grants had to be approved by the Board. McAfee

23  granted stock options to employees at the time of hiring. The Company also reportedly made "merit

24  grants," which included grants made when an employee was promoted or after the employee's

25  annual review. The annual reviews reportedly took place in February or March for the prior year

26  and raises were made retroactive to January. The Compensation Committee determined the options

27  to be granted to the executives. Option grants to other employees, as well as consultants, were

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 34 -

1  determined and approved by a committee consisting of two or more directors appointed by the

2  Board.

3  **Suspicious Option Grants During the Relevant Period**

4      85.    Throughout the Relevant Period, defendants caused the Company to issue stock

5  options that were dated suspiciously to coincide with the lowest closing price of the Company's

6  stock during the period in which they were granted. Of the publicly reported option grants – those

7  grants made to the most highly compensated executives – most of the grants made between 1996 and

8  2002 reflect grant dates of days where McAfee stock was at one of the lowest prices of the year.

9      86.    The first questionable option grants is the grant made to defendant Goyal at the

10  beginning of his employment. Goyal came to work for McAfee in March 1996. His Employment

11  Agreement was signed on March 18, 1996 and the 200,000 options he was granted at his hiring

12  vested on the anniversary of the grant: March 18. However, the expiration date of the options and

13  exercise price of the options show that the options were backdated to March 4, 1996, when the stock

14  had a closing price of $12.87, $6.13 lower than the closing price on March 18, 1996.



15

16

17

18

19

20

21

22

23

24

25

26

27

28

87.    In 1997, McAfee's four highest-paid executives received option grants at prices which rank near the lowest closing price of the year for McAfee stock as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|-------------------|----------------|---------------------|
| William Larson | 800,000 | $26.67 | 3/20/1997 |
| Prabhat Goyal | 200,000 | $26.67 | 3/20/1997 |
| Dennis Cline | 200,000 | $26.67 | 3/20/1997 |
| Peter Watkins | 200,000 | $26.67 | 3/20/1997 |

88.    These defendants together were granted 1.4 million stock options on March 20, 1997, the second lowest closing price of the year, according to Form 4s filed with the SEC by defendant Nelson, who was not included in the disclosure in the Proxy Statement. Nelson also received at least 50,000 options on March 20, 1997, yet his employment did not begin until six days later. Defendant Nelson has realized at least $925,404 in profits on these suspicious options.



89.    In 1998, McAfee's six highest-paid executives received option grants as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|------|------|------|
| William Larson | 300,000 | $31.333 | 1/12/1998 |
| Prabhat Goyal | 225,000 | $31.333 | 1/12/1998 |
| Peter Watkins | 225,000 | $31.333 | 1/12/1998 |
| Zachary Nelson | 225,000 | $31.333 | 1/12/1998 |
| Leslie Denend | 240,000 | $31.333 | 1/12/1998 |
| John Stringer | 225,000 | $31.333 | 1/12/1998 |

90.    In addition to the above referenced defendants, defendant Cline also received an option grant on January 12, 1998, at one of the lowest closing prices of the year, and the single lowest trading day for the first three quarters of 1998.



91.    In 1999, McAfee's four highest-paid executives received McAfee option grants as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|------|------|------|
| Evan Collins | 10,000 | $11.06 | 4/20/1999 |
| Prabhat Goyal | 100,000 | $12.25 | 5/5/1999 |
| Peter Watkins | 100,000 | $12.25 | 5/5/1999 |
| Zachary Nelson | 200,000 | $12.25 | 5/5/1999 |

1    92.    Defendants Collins, Roberts and Hodges received options dated for one of the three

2  days of the year (April 20-22, 1999) with the lowest closing price. Goyal, Watkins, and Nelson

3  received options dated for a day with the third lowest closing price of the year.[7]



20 ───────────────

On March 31, 1999, defendant Samenuk announced to all employees that their options would
21  be "repriced" – *i.e.*, the exercise price of the options would be lowered – because the stock price had
    not been increasing as hoped and many of the employees' options were under water. The options
22  were not repriced for March 31, 1999, however. Instead, as with so many grants, defendants chose a
    day with a particularly low closing price: April 22, 1999, one of the three days that shared the lowest
23  closing price of the year. This instance of manipulating – which directly cost the Company
    approximately $20.4 million – was made without seeking shareholder approval. The size of the
24  charge shows how important the difference a few days can be. This charge was due to the difference
    between the closing price on April 22, 1999 and the closing price on the day – April 28, 1999 or
25  earlier, that the repricing offer was accepted by each employee. Moreover, it went against the stated
    purpose of the Stock Incentive Plan, by disaligning the interests of the employees from the interests
26  of the shareholders. On this occasion, employees were *rewarded* for the falling stock price by being
    given the right to purchase stock at a lower price because the stock price had fallen; shareholders
27  were simply left with stock that they purchased at a higher price.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      - 38 -

1    93.    In 2000, defendants Hodges and Roberts also received suspicious option grants. On

2    April 14, 2000 Roberts received an option grant for 30,000 shares. This was the lowest closing price

3    for McAfee stock during the first half of 2000.





19    94.    In 2001, four of McAfee's four highest-paid executives received option grants as

20    follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|-------------------|----------------|----------------------|
| George Samenuk | 1,200,000 | $4.9375 | 1/3/2001 |
| Stephen Richards | 600,000 | $6.00 | 4/4/2001 |
| Gene Hodges | 300,000 | $4.1875 | 1/2/2001 |
| Zachary Nelson | 400,000 | $4.1875 | 1/2/2001 |

26    95.    Hodges and Nelson both received options on the day of the year with the lowest

27    closing price, and Samenuk received options on the day of the year with the third lowest closing

28    price. Richards received grants near the lowest closing price of the year.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 39 -

1    96.    Defendants Richards' April 4, 2001 stock option grant was dated for the ninth lowest
2  day of the year, but the lowest of the months he worked for McAfee. The grant was purportedly
3  made on the date his employment began, yet his employment agreement states that his employment
4  began on April 10, 2001, when closing stock price was $7.45. The day of the grant was not April 10,
5  2001, however. Instead, the purported grant date was April 4, 2001, *the day with the lowest closing
6  price – $6.00 – for all the months of 2001 that Richards worked*. This difference of $1.45 between
7  the grant date price and the start date price, multiplied by 600,000 options, means that upon the grant
8  is an instant risk free profit of $870,000 at the cost of the Company.  Richards has realized at least
9  $362,500 of this unlawful profit by exercising at least 250,000 of the 600,000 illegally backdated
10  shares.



24    97.    In 2002, four of McAfee's highest-paid executives received option grants as follows:

| Name | Number of Options | Exercise Price | Purported Grant Date |
|------|-------------------|----------------|----------------------|
| George Samenuk | 420,000 | $25.43 | 1/16/2002 |
| Stephen Richards | 100,000 | $25.43 | 1/15/2002 |
| Arthur Matin | 150,000 | $8.45 | 10/8/2002 |
| Kent Roberts | 100,000 | $16.29 | 5/6/2002 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 40 -

1    98.    Matin received a grant dated October 8, 2002, the day with the lowest closing price of
2    the year.  January 16, 2002, the date of Samenuk's purported grant, had the lowest closing stock
3    price of that month.  January 15, 2002, the date of Richards' purported grant, had a significantly
4    higher closing price ($27.19 up $1.76), than the closing price on January 16, 2003.  However,
5    according to McAfee's November 14, 2003 Proxy Statement, Richards' option grant was
6    nonetheless given the lower, January 16, 2002 exercise price.  On May 6, 2002, Roberts received
7    options with the lowest price for the first half of the year.



22    99.    On December 29, 2006, McAfee issued a press release admitting to mispricing
23    numerous options and grants to several defendants, including grants to Samenuk on May 4, 2004,
24    and January 16, 2002, grants to Weiss on October 15, 2002, July 16, 2003, December 10, 2003 and
25    May 4, 2004.  Further, defendants Denend, O'Leary and Wilson also received mispriced options
26    which had to be repriced.

1    **McAfee Sought and Received Shareholders' Approval**
**Through the Issue of False and Misleading Proxy Statements**

2

3    100.    Throughout the Relevant Period, McAfee filed Proxy Statements with the SEC that

stated: "all options were granted at an exercise price equal to the fair market value of the common

4    stock on the date of grant."

5    **McAfee's False 1997 14-A Proxy Statement**

6

7    101.    On April 24, 1997, McAfee filed a Form 14-A Proxy Statement with the SEC. In its

1997 Proxy Statement, McAfee's Board presented a new Stock Incentive Plan to the shareholders

8    for approval. One stated purpose of this new plan was to eliminate the ability of the Board to grant

9    options at less than fair market value. The Board, including defendants Larson and Denend, made

10    the following representations about its stock option grants to employees:

11

12    The Incentive Plan is intended to offer a significant incentive by enabling key
employees to acquire options to purchase Common Stock at a price equal to its fair
market value on the date the option is granted. *The options will become valuable to*

13    *the recipients only if the price of the Company's Common Stock appreciates*
*following the grant and when such options have vested.* By providing key

14    employees with the opportunity to acquire an equity interest in the Company over
time and because a benefit is only received through improved stock performance, the

15    Company believes that stock options serve to align the interests of key employees
closely with other stockholders.

16

17    102.    This statement was false when made. First, defendants knew but failed to disclose

18    that defendants had manipulated many of the grant dates by choosing dates where, in fact, the

exercise price of the stock options granted was less than the fair market value of the common stock

19    on the date the option was granted. For example, in 1997, Watkins and defendants Larson, Goyal,

20    Cline and Nelson each received options with the purported grant date of March 20, 1997 and

21    exercise price of $40.00.[8] Approval of the Board or a committee thereof was required to make these

22    grants and was obtained by defendants.

23

24    103.    Second, the backdated options were "in the money" at the time they were actually

granted. Thus, the stock price did not have to appreciate for the options to become valuable or for a

25    benefit to be received.

26    _____

27    [8]    Amount is unadjusted for stock split.

28

1    104.    Third, because there was no need for the stock price to appreciate for the options to

2 have value, the interests of the employees receiving backdated options were not closely aligned with

3 those of other stockholders. The recipients of stock options had an interest in the stock not going

4 down, but would benefit if the stock merely remained flat and they remained employed until the

5 stock options vested.

6    105.    The April 24, 1997 Proxy Statement also falsely stated "[t]he exercise price of an ISO

7 [incentive stock option] must be equal to or greater than the fair market value of the Common Stock

8 on the date of grant." As discussed above, the exercise price of the options was less than the fair

9 market value of the common stock on the day that the options were actually granted.

10    106.    McAfee's 1997 Proxy Statement stated that Larson was awarded no stock options in

11 1996. This was false, because, as acknowledged in McAfee's 1999 Proxy Statement, Larson was, in

12 fact, awarded 1,771,875 options in 1996.

13    107.    The Company's April 24, 1997 Proxy Statement also describes the Company's

14 Compensation Committee, its members, and their responsibilities:

15      The Compensation Committee's function is to review and approve salary levels and
        stock option grants. During the year ended December 31, 1996, the members of the
16      Compensation Committee were Ms. Gemmell and Messrs. Chambers, Denend and
        Kortschak. The current members of the Compensation Committee are Ms. Gemmell
17      and Mr. Denend. During the year ended December 31, 1996, the Compensation
        Committee held four (4) meetings.

18
        108.    The Company's April 24, 1997 Proxy Statement describes the Company's Audit
19
Committee, its members, and their responsibilities:
20
        The Audit Committee's function is to review with the Company's independent
21      accountants and management the annual financial statements and independent
        accountants' opinion, review the scope and results of the examination of the
22      Company's financial statements by the independent accountants, approve all
        professional services and related fees performed by the independent accountants,
23      recommend the retention of the independent accountants to the Board, subject to
        ratification by the stockholders, and periodically review the Company's accounting
24      policies and internal accounting and financial controls. During the year ended
        December 31, 1996, the members of the Audit Committee were Messrs. Bolger,
25      Chambers, Harper and Kortschak. The current members of the Audit Committee are
        Messrs. Bolger and Harper. During the year ended December 31, 1996, the Audit
26      Committee held four (4) meetings.

27    109.    The 1997 Proxy Statement was signed by defendant Goyal by order of the Board.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 43 -