1

### McAfee's False 1998 14-A Proxy Statement

2      110.    The Company's April 30, 1998 Proxy Statement describes the Company's

3  Compensation Committee, its members and responsibilities:

4          The Compensation Committee's function is to review and approve salary and stock
           option grants.  During the year ended December 31, 1997, the members of the
5          Compensation Committee were Ms. Gemmell, Mr. Denend and Mr. Harper.  The
           current members of the Compensation Committee are Ms. Gemmell and Mr. Harper.
6          During the year ended December 31, 1997, the Compensation Committee held four
           (4) meetings.

7
       111.    The April 30, 1998 Proxy Statement again falsely represented that:
8
           The Incentive Plan is intended to offer a significant incentive by enabling key
9          employees to acquire options to purchase Common Stock at a price equal to its fair
           market value on the date the option is granted.  ***The options will become valuable to***
10         ***the recipients only if the price of the Company's Common Stock appreciates***
           ***following the grant and when such options have vested.***  By providing key
11         employees with the opportunity to acquire an equity interest in the Company over
           time and because a benefit is only received through improved stock performance, the
12         Company believes that stock options serve to align the interests of key employees
           closely with other stockholders.

13
       112.    Additionally, the 1998 Proxy Statement repeated that "[t]he exercise price of an ISO
14
   [incentive stock option] must be equal to or greater than the fair market value of the Common Stock
15
   on the date of grant."  This was false, because, as discussed above, the exercise price of the options
16
   were less than the fair market value of the common stock on the day that the options were actually
17
   granted.
18
       113.    McAfee's 1998 Proxy Statement again stated that Larson was awarded no stock
19
   options in 1996.  This was false, because, as acknowledged in McAfee's 1999 Proxy Statement,
20
   Larson was, in fact, awarded 1,771,875 options in 1996.
21
       114.    The Company's 1998 Proxy Statement also states the following about the Company's
22
   Audit Committee, its members, and their responsibilities:
23
           The Audit Committee's function is to review with the Company's independent
24         accountants and management the annual financial statements and independent
           accountants' opinion, review the scope and results of the examination of the
25         Company's financial statements by the independent accountants, approve all
           professional services and related fees performed by the independent accountants,
26         recommend the retention of the independent accountants to the Board, subject to
           ratification by the stockholders, and periodically review the Company's accounting
27         policies and internal accounting and financial controls.  During the year ended
           December 31, 1997, the members of the Audit Committee were Messrs. Harper and
28         Bolger.  The current members of the Audit Committee are Mr. Harper and Dr. Saal.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 44 -

Effective April 30, 1998, Mr. Bolger resigned from the Board of Directors. During the year ended December 31, 1997, the Audit Committee held four (4) meetings.

115.    The April 30, 1998 Proxy Statement was signed by defendant Goyal by order of the Board.

## McAfee's False 1999, 2000, 2001 and 2002 14-A Proxy Statements

116.    As it did in 1997 and 1998, the Board stated in its Form 14-A Proxy Statements filed with the SEC on May 17, 1999, May 5, 2000, May 1, 2001 and April 11, 2002, that all options were granted at an exercise price equal to the fair market value of the common stock on the date of the grant. Each Proxy Statement falsely reiterated that "[t]he exercise price of an ISO [incentive stock option] must be equal to or greater than the fair market value of the Common Stock on the date of grant." These statements were false, because, as discussed above, defendants knew but failed to disclose that due to the backdating of the options, the exercise price of the options was less than the fair market value of the common stock on the day that the options were actually granted.

117.    The Company's May 17, 1999 Proxy Statement states the following about the Company's Compensation Committee and its responsibilities:

THE COMPENSATION COMMITTEE reviews and approves executive salary levels and stock option grants. The Compensation Committee held two meetings during 1998.

Members: Virginia Gemmell and Edwin Harper.

118.    The Company's May 17, 1999 Proxy Statement states the following about the Company's Audit Committee, its members, and their responsibilities:

THE AUDIT COMMITTEE recommends the appointment of the independent auditors, reviews the scope and results of their examinations and approves all of their professional services and related fees. It also periodically reviews our accounting policies and internal accounting and financial controls. The Audit Committee held three meetings during 1998.

Members: John Bolger (to April 30, 1998), Edwin Harper and Leslie Denend (from April 30, 1998).

119.    The May 17, 1999 Proxy Statement was signed by defendant Goyal by order of the Board.

120.    The Company's April 24, 2000 Proxy Statement made the following statements about the Compensation Committee, its members and responsibilities:

1   THE COMPENSATION COMMITTEE reviews and approves executive salary levels and stock option grants. The Compensation Committee held four meetings during 1999.

2

3   Members: Virginia Gemmell and Edwin Harper.

4   121.   The Company's April 24, 2000 Proxy Statement states the following about the

5   Company's Audit Committee, its members, and their responsibilities:

6   THE AUDIT COMMITTEE reviews, acts and reports to our Board of Directors on various auditing and accounting matters, including the appointment of our independent accountants, the scope of our annual audits, fees to be paid to the independent accountants, the performance of our independent accountants and our accounting practices. The Audit Committee held three meetings during 1999.

7

8

9   Members: Edwin Harper, Virginia Gemmell, Enzo Torresi. Mr. Torresi was added to our Audit Committee in March 2000.

10

11   122.   The April 24, 2000 Proxy Statement was signed by defendant Goyal by order of the

12   Board.

13   123.   The Company's May 1, 2001 Proxy Statement described the duties of the

14   Compensation Committee of the Board and its members as follows:

15   THE COMPENSATION COMMITTEE reviews and approves executive salary levels and stock option grants. The Compensation Committee held three meetings during 2000.

16

17   In 2000, Virginia Gemmell and Edwin Harper were members of the Compensation Committee. Robert Dutkowsky was added to our Compensation Committee in April 2001.

18

19   124.   The Company's May 1, 2001 Proxy Statement states the following about the

20   Company's Audit Committee, its members, and their responsibilities:

21   THE AUDIT COMMITTEE reviews, acts and reports to our Board of Directors on various auditing and accounting matters, including the appointment of our independent accountants, the scope of our annual audits, fees to be paid to the independent accountants, the performance of our independent accountants and our accounting practices. The Audit Committee held four meetings during 2000. In 2000, Edwin Harper, Virginia Gemmell, and Enzo Torresi were members of the audit committee. Mr. Torresi will leave the audit committee at the end of his term as a Class III Director. Robert Pangia was added to our Audit Committee in April 2001.

22

23

24

25   125.   The May 1, 2001 Proxy Statement was signed by defendant Roberts by order of the

26   Board.

27   126.   The Company's April 11, 2002 Proxy Statement states the following about the

28   Company's Compensation Committee, its members, and their responsibilities:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

During 2001, the compensation committee of the board of directors consisted of Mr. Dutkowsky, Ms. Gemmell and Mr. Harper, none of whom served as our employee or officer at any time. The compensation committee is responsible for setting and administering policies governing compensation of executive officers, including the annual Executive Bonus Plan, the 2000 Nonstatutory Stock Option Plan and the 1997 Stock Incentive Plan. In addition, the compensation committee reviews compensation levels of other management level employees, evaluates the performance of management and reviews other compensation-related issues.

127.    The Company's April 11, 2002 Proxy Statement states that Pangia, Gemmell and Harper were the members of the Audit Committee in 2001.

128.    The April 11, 2002 Proxy Statement was signed by defendant Roberts by order of the Board.

### McAfee's 2003 False 14-A Proxy Statement

129.    On November 14, 2003, the Company filed its Form 14-A Proxy Statement with the SEC. The Proxy Statement purported to, among other things, describe the Board's practices for determining appropriate levels of compensation for executives, including option grants pursuant to its 1997 stock incentive program. The Proxy Statement falsely stated that options were granted to executives and employees at market price:

We believe that stock options are an important factor in attracting, motivating, and retaining qualified personnel who are essential to our success. The 1997 Stock Incentive Plan is intended to offer a significant incentive by allowing employees to purchase our common stock. *With limited exceptions, options to purchase our common stock are granted under our 1997 Stock Incentive Plan at a price equal to the fair market value on the date stock options are granted.* Other than in limited cases, options granted under the 1997 Stock Incentive Plan only become valuable if the price of our common stock increases over time and as the options vest.

130.    The Company's November 14, 2003 Proxy Statement states the following about the Compensation Committee and its duties and responsibilities:

The Compensation Committee reviews and approves executive salary levels and stock option grants. The Compensation Committee held 4 meetings during 2002. Mr. Dutkowsky, Mr. O'Leary and Mr. Pangia are members of our compensation committee. Ms. Wilson and Mr. Pangia joined our compensation committee in 2002. In July 2003, Ms. Wilson resigned from the compensation committee and Mr. O'Leary joined the compensation committee.

131.    The Company's November 14, 2003 Proxy Statement states the following about the Company's Audit Committee, its members, and their responsibilities:

The Audit Committee reviews, acts and reports to our board of directors on various auditing and accounting matters, including the appointment of our independent

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 47 -

1    accountants, the scope of our annual audits, fees to be paid to the independent
2    accountants, the approval of services to be performed by our independent
     accountants, the performance of our independent accountants and our accounting
3    practices. The audit committee held 6 meetings during 2002. Mr. Dutkowsky, Ms.
     Wilson and Mr. Pangia are members of our audit committee. Ms. Wilson and Mr.
4    Dutkowsky joined the audit committee in 2002.

5    132.    The November 14, 2003 Proxy Statement was signed by defendant Roberts by order

6    of the Board.

7                        **McAfee's 2004 False 14-A Proxy Statement**

8    133.    On April 9, 2004, the Company filed its Form 14-A Proxy Statement with the SEC.

9    The 2004 Proxy Statement purported to, among other things, describe the Company's practices of

10   determining appropriate levels of compensation for executives, including option grants pursuant to

11   its 1997 stock incentive program. As explained in the 2004 Proxy Statement, stock options granted

12   to employees were valued as follows:

13   Options may include nonstatutory stock options ("NSOs") as well as incentive stock
     options ("ISOs") intended to qualify for special tax treatment. The term of an option
14   cannot exceed 10 years. ***The exercise price of an ISO must be equal to or greater
     than the fair market value of the common stock on the date of grant,*** while the
15   exercise price of an NSO must be equal to or greater than 85% of fair market value.
     As of March 31, 2004, the closing price of the company's common stock on the New
16   York Stock Exchange was $18.00 per share.

17   134.    The Company's April 9, 2004 Proxy Statement states the following regarding the

18   Compensation Committee, its members and responsibilities:

19   The Compensation Committee reviews and approves executive salary levels and
     stock option grants. The compensation committee held 4 meetings during 2003. Mr.
20   Dutkowsky, Mr. O'Leary and Mr. Pangia are members of our compensation
     committee. Mr. O'Leary joined our compensation committee in 2003. Each member
21   of our compensation committee is "independent" as defined under the New York
     Stock Exchange corporate governance standards.

22   135.    The Company's April 9, 2004 Proxy Statement states the following about the

23   Company's Audit Committee, its members, and their responsibilities:

24   The Audit Committee reviews, acts and reports to our board of directors on various
     auditing and accounting matters, including the appointment of our independent
25   accountants, the scope of our annual audits, fees to be paid to the independent
     accountants, the approval of services to be performed by our independent
26   accountants, the performance of our independent accountants and our accounting
     practices. The audit committee held 5 meetings during 2003. Mr. Dutkowsky, Ms.
27   Wilson and Mr. Pangia are members of our audit committee. Mr. Pangia is the audit
     committee "financial expert" (as is currently defined under the SEC rules
28   implementing Section 407 of the Sarbanes-Oxley Act of 2002).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 48 -

1    136.    The April 9, 2004 Proxy Statement was signed by defendant Roberts by order of the

2  Board.

3    **MCAFEE'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP**

4    137.    As a result of defendants' improper backdating of stock options, defendants caused

5  McAfee to violate GAAP, SEC regulations and IRS rules and regulations.

6    138.    McAfee's financial results for 1996-2005 were included in reports filed with the SEC

7  and in other shareholder reports.  In these reports, defendants represented that McAfee's financial

8  results were presented in a fair manner and in accordance with GAAP.

9    139.    Defendants' representations were false and misleading as to the financial information

10  reported, as such financial information was not prepared in conformity with GAAP, nor was the

11  financial information "a fair presentation" of the Company's financial condition and operations,

12  causing the financial results to be presented in violation of GAAP and SEC rules.

13    140.    GAAP consists of those principles recognized by the accounting profession as the

14  conventions, rules, and procedures necessary to define accepted accounting practice at the particular

15  time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

16  C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

17  in compliance with GAAP, are presumed to be misleading and inaccurate.

18    141.    During the Relevant Period, defendants caused the Company to understate its

19  compensation expense by not properly accounting for its stock options under GAAP and thus

20  overstated the Company's net earnings.

21    142.    Under well-settled accounting principles in effect throughout the Relevant Period,

22  McAfee did not need to record an expense for options granted to employees at the current market

23  price ("at the money").  The Company was, however, required to record an expense in its financial

24  statements for any options granted below the current market price ("in the money").  In order to

25  provide McAfee executives and employees with far more lucrative "in the money" options, while

26  avoiding having to inform shareholders about millions of dollars incurred by the Company in

27  compensation expenses (and without paying the IRS millions of dollars in employment taxes),

28

1  defendants systematically falsified Company records to create the false appearance that options had

2  been granted at the market price on an earlier date.

3        143.    Throughout the Relevant Period, McAfee accounted for stock options using the

4  intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees."[9] Under

5  APB No. 25, employers were required to record as an expense on their financial statements the

6  "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money

7  on the measurement date has intrinsic value, and the difference between its exercise price and the

8  quoted market price must be recorded as compensation expense to be recognized over the vesting

9  period of the option. Options that are at-the-money or out-of-the-money on the measurement date

10  need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record

11  compensation expenses on options granted to non-employees irrespective of whether they were in-

12  the-money or not on the date of grant.

13  **McAfee's Forthcoming Restatement Is an Admission of Falsity**

14        144.    As stated herein, the fact that McAfee revised and restated downward its net income

15  is an admission that the financial statements originally issued were false when they were reported

16  and that the misstatements were material.

17        145.    Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and

18  revisions announced by McAfee were to correct for material errors in previously issued financial

19  statements. APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored

20  method of recognizing an accounting change as it dilutes confidence by investors in the financial

21  statements, it makes it difficult to compare financial statements and it is often difficult, if not

22  impossible, to generate the numbers when restatement occurs. APB No. 20, ¶14. Thus, GAAP

23  provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is

24

25  [9]    APB No. 25 was later superseded by Statement of Financial Accounting Standards (SFAS)
    No. 123, *Share-Based Payment*. SFAS No. 123 went into effect for large publicly traded companies
26  for all interim or annual reporting periods that began after June 15, 2005. Under SFAS No. 123,
    companies are required to account for their stock option grants using the fair market value method
27  rather than the intrinsic value method. The new method requires a company to expense all employee
    stock options when granted.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        - 50 -

1   a change in the reporting entity, there is a change in accounting principles used or to correct an error

2   in previously issued financial statements.  McAfee's restatements and revisions were not due to a

3   change in reporting entity or a change in accounting principle, but rather to errors in previously

4   issued financial statements.  Thus, the restatements and revisions were an admission by McAfee that

5   its previously issued financial results and its public statements regarding those results were false and

6   misleading.

7   **McAfee's GAAP Violations Were Material**

8       146.   McAfee's false and misleading Relevant Period statements and omissions regarding

9   its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff

10  Accounting Bulletin ("SAB") Topic 1M, *Materiality*, summarizes GAAP definitions of materiality.[10]

11  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood

12  that a reasonable person would consider it important."  It also stresses that materiality requires

13  qualitative, as well as quantitative, considerations.  For example, if a known misstatement would

14  cause a significant market reaction that reaction should be taken into account in determining the

15  materiality of the misstatement.

16      147.   SAB Topic 1M further states:

17      Among the considerations that may well render material a quantitatively
18  small misstatement of a financial statement item are –

            *          *          *

19
20      whether the misstatement masks a change in earnings or other trends

21      whether the misstatement hides a failure to meet analysts' consensus
    expectations for the enterprise

22          *          *          *

23  _____

24  [10]   SAB Topic 1M, *Materiality*, represents the codification of certain SABs, including SAB
25  No. 99, *Materiality*, as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.  On September
    13, 2006, the SEC issued SAB 108 – new guidance for determining materiality of past errors.  This
26  new standard is effective for financial statements for fiscal years ending after November 15, 2006.
    Under SAB 108, the fundamental principles surrounding materiality remain consistent with
27  materiality under the prior guidance.  However, this new guidance requires companies to evaluate
    known errors to a finer degree than in the past.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                   - 51 -

1    whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

3    148.    SAB Topic 1M also says that an intentional misstatement of even immaterial items

4    may be illegal and constitute fraudulent financial reporting.

5    149.    McAfee's misstatements, by its own admissions, satisfy these criteria and thus were

6    material from both a quantitative and qualitative perspective.

7    **McAfee's Financial Statements Violated Fundamental Concepts of GAAP**

8    150.    Due to these accounting improprieties, the Company presented its financial results

9    and statements in a manner that violated GAAP, which are described by the following statements:

10    (a)    The principle that interim financial reporting should be based upon the same

11    accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

12    (b)    The principle that financial reporting should provide information that is useful

13    to existing and potential investors and creditors and other users in making rational investment, credit

14    and similar decisions (FASB Statement of Concepts No. 1, ¶34);

15    (c)    The principle that financial reporting should provide information about the

16    economic resources of an enterprise, the claims to those resources, and the effects of transactions,

17    events and circumstances that change resources and claims to those resources (Financial Accounting

18    Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

19    (d)    The principle that financial reporting should provide information about how

20    management of an enterprise has discharged its stewardship responsibility to stockholders for the use

21    of enterprise resources entrusted to it.   To the extent that management offers securities of the

22    enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective

23    investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

24    (e)    The principle that financial reporting should be reliable in that it represents

25    what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

26    (f)    The principle of completeness, which means that nothing is left out of the

27    information that may be necessary to insure that it validly represents underlying events and

28    conditions (FASB Statement of Concepts No. 2, ¶79); and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      (g)    The principle that conservatism be used as a prudent reaction to uncertainty to

2   try to ensure that uncertainties and risks inherent in business situations are adequately considered

3   (FASB Statement of Concepts No. 2, ¶¶95, 97).

4      151.    Further, the undisclosed adverse information concealed by defendants during the

5   Relevant Period is the type of information which, because of SEC regulations, regulations of the

6   national stock exchanges and customary business practice, is expected by investors and securities

7   analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

8   be the type of information which is expected to be and must be disclosed.

9   **Violations of the SEC Regulations**

10     152.    During the Relevant Period, defendants caused McAfee to violate SEC regulations by

11  failing to disclose that the Company's senior executives had been granted backdated stock options.

12     153.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

13  must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item

14  402(b) and (c) require a company to provide both a Summary Compensation Table and an

15  Option/SAR Grants table identifying the compensation of the named executive officers – the

16  Company's CEO and its next four most highly paid executives. Item 402 requires particularized

17  disclosures involving a company's stock option grants in the last fiscal year. In the summary

18  compensation table, the issuer must identify in a column "other annual compensation" received by

19  the named executives that is not properly categorized as salary or bonus, including any "[a]bove

20  market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to

21  the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must

22  identify in a column "[t]he per-share exercise or base price of the options . . . . *If such exercise or*

23  *base price is less than the market price of the underlying security on the date of grant, a separate,*

24  *adjoining column shall be added showing market price on the date of grant*. . . ." Item

25  402(c)(2)(iv).

26     154.    Defendants caused McAfee to violate SEC regulations by failing to disclose that the

27  Company's named executive officers had been granted options with exercise prices below the

28  market value on the date the Board or Compensation Committee approved the grant.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 53 -

**Violations of IRS Rules and Regulations**

155.    During the Relevant Period, defendants further caused McAfee to violate IRS rules and regulations due to its improper accounting for the backdated stock options.  As a result, the Company's tax liabilities were understated exposing McAfee to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

156.    Defendants caused the Company to violate IRS Code §162(m) which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders.  Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

157.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options.  According to former SEC Chairman Harvey Pitt:  "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

158.    Defendants caused McAfee to violate IRS Code §162(m) by providing backdated options to the Company's named executive officers which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant.  As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

159.    Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the

1  exercise of McAfee's stock options by improperly accounting for its Nonqualified Stock Options

2  ("NSOs") as Incentive Stock Options ("ISOs").

3      160.   ISOs are a form of equity compensation that may be provided to a company's

4  employees. ISOs are required to be granted at an exercise price that is no less than the fair market

5  value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not

6  subject to income tax upon exercise of the options but only upon sale of the stock (except for the

7  possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock

8  options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential

9  treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a

10  company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees

11  would be liable for the amount of the income tax and FICA that the company failed to withhold upon

12  exercise of the options, in addition to interest and penalties.

13      161.   By improperly treating its backdated options as ISOs, defendants failed to provide

14  proper income tax and FICA withholdings upon the exercise of its options by its executives and

15  employees in violation of IRS rules and regulations.

16      162.   The chart below illustrates McAfee's false and misleading annual financial results

17  which overstate Company earnings as a result of understating Company expenses:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| 1996 | $64.11 million | $0.85 |
| 1997 | $10.64 million | $0.61 |
| 1998 | $36.44 million | $0.87 |
| 1999 | ($156.88 million) | ($1.27) |
| 2000 | ($123.93 million) | ($0.90) |
| 2001 | $83.25 million | $0.33 |
| 2002 | $128.31 million | $1.18 |
| 2003 | $70.24 million | $0.74 |
| 2004 | $5.32 million | $0.17 |
| 2005 | $138.83 million | $1.22 |

18      163.   Meanwhile, defendants were causing the Company to grant them millions of stock

options, many of which were backdated or misdated. The Company's executives received a

significant number of stock options as compensation during the Relevant Period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**The False 1997 Form 10-K**

164.    On February 17, 1998, the Company filed its 1997 Form 10-K with the SEC.  The 1997 Form 10-K included McAfee's 1997 financial statements, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, McAfee's compensation expense was understated and its net earnings were overstated.

165.    In addition, the 1997 10-K included the following representation that one purpose of the 1997 changes to the Stock Incentive Plan was to

> (b) eliminate the ability of the Company's Board of Directors (the "Board") to grant options thereunder with an exercise price less than the fair market value of the Company's Common Stock on the date of grant.

166.    As discussed above this was false.  Defendants knew but failed to disclose that even under the 1997 Stock Incentive Plan, stock options were routinely granted with an exercise price less than that of the date on which the options were actually granted.  Additionally, the Company knowingly and falsely represented in the 10-K that:

> *The Company accounts for stock-based compensation using the intrinsic value method prescribed by APB Opinion No. 25,* "Accounting for Stock Issued to Employees."  Accordingly, compensation cost for stock options is measured as the excess, if any, of the quoted market price of the Company's stock at the date of the grant over the amount an employee must pay to acquire the stock.  The Company has adopted the disclosure-only provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation."

167.    As discussed above at ¶29, the Company has already admitted that it did not properly apply APB No. 25.

168.    The February 17, 1998 Form 10-K was signed by Larson, Denend, Goyal, Bolger, Gemmell, Harper and Saal.

**The False 1998 Form 10-K**

169.    On April 15, 1999, the Company filed its 1998 Form 10-K with the SEC.  The 1998 Form 10-K included McAfee's 1998 financial statements, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, McAfee's compensation expense was understated and its net earnings were overstated.

170.    In addition, in the 1998 10-K, the Company made the following false and misleading representations regarding the 1997 Plan:

> *The plan provides for an option price no less than 100% of the fair market value of the Company's common stock on the date of grant for incentive stock options* granted to employees and officers (including directors who are also employees) or 85% of the fair market value on the date of grant for all others.  The options may be exercisable immediately, or over time, generally vest 25% one year after commencing employment or from date of grant and vest thereafter in monthly increments over three years.  All options under the option plan expire ten years after grant.

171.    This statement was false when made.  Defendants knew but failed to disclose that many options were granted at a price lower than that of the day they were actually granted.  The 1998 Form 10-K informed shareholders that during the fiscal year members of the Compensation Committee of the Board were responsible for approving stock options issued to Company executives:

> "THE COMPENSATION COMMITTEE reviews and approves executive salary levels and stock option grants.  The Compensation Committee held two meetings during 1998.  Members: Virginia Gemmell and Edwin Harper."

With respect to options granted to directors, the Form 10-K stated:

> COMPENSATION OF DIRECTORS . . . . Under our Stock Option Plan for Outside Directors, non-employee directors are automatically granted an option to purchase 37,500 shares of our common stock, when they first become a director.  Each year after the initial grant, they are entitled to receive an additional option grant to purchase up 15,000 shares of our common stock. . . . *All options are granted at the fair market value on the date of grant.*

172.    The Company again indicated that it had "elected to continue accounting for [stock incentive] plans in accordance with APB No. 25."

173.    The April 15, 1999 Form 10-K was signed by Larson, Goyal, Denend, Gemmell and Harper.

**The False 1998 Form 10-K/A**

174.    On or about April 15, 1999, McAfee filed an amendment to its 1998 Form 10-K.  This amendment again indicated that in 1997, a proposal to change the Stock Incentive Plan had been presented for the shareholders' approval to "eliminate the ability of the Company's Board of Directors (the 'Board') to grant options thereunder with an exercise price less than the fair market

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                          - 57 -

1  value of the Company's Common Stock on the date of grant." For the same reasons discussed

2  above, this statement was false.

3      175.    The Amended 10-K also reiterated the false and misleading statement regarding the

4  1997 Plan:

5      *The plan provides for an option price no less than 100% of the fair market value of*
       *the Company's common stock on the date of grant for incentive stock options*
6      granted to employees and officers (including directors who are also employees) or
       85% of the fair market value on the date of grant for all others.

7      176.    The April 15, 1999 Amendment to Form 10-K was signed by Larson, Goyal, Denend,

8  Gemmell and Harper.

9  **The False 1999 Form 10-K**

10     177.    On March 30, 2000, the Company filed its 1999 Form 10-K with the SEC. The 1999

11 Form 10-K included McAfee's 1999 financial statements, which were materially false and

12 misleading and presented in violation of GAAP, due to knowing and improper accounting for the

13 backdated stock options. As a result, McAfee's compensation expense was understated and its net

14 earnings were overstated.

15     178.    The 1999 Form 10-K was signed by Larson, Goyal, Denend, Gemmell, Harper and

16 Torresi.

17 **The False 2000 Form 10-K**

18     179.    On April 2, 2001, the Company filed its 2000 Form 10-K with the SEC. The 2000

19 Form 10-K included McAfee's 2000 financial statements, which were materially false and

20 misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

21 options. As a result, McAfee's compensation expense was understated and its net earnings were

22 overstated.

23     180.    The April 2, 2001 Form 10-K was signed by Samenuk, Davis, Denend, Gemmell,

24 Harper and Torresi.

25 **The False 2001 Form 10-K**

26     181.    On February 8, 2002, the Company filed its 2001 Form 10-K with the SEC. The

27 2001 Form 10-K included McAfee's 2001 financial statements, which were materially false and

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  misleading and presented in violation of GAAP, due to its improper accounting for the backdated

2  stock options.  As a result, McAfee's compensation expense was understated and its net earnings

3  were overstated.

4        182.    The Form 10-K included the same knowingly false and misleading statement that

5  "[t]he McAfee Plan provides for an option price no less than 100% of the fair market value of

6  McAfee.com's common stock on the date of grant for incentive stock options granted to employees

7  and officers."

8        183.    The 2001 Form 10-K was signed by Samenuk, Richards, Harper, Denend, Gemmell,

9  Dutkowsky and Pangia.

10  **The False 2002 Form 10-K**

11        184.    On October 31, 2003, the Company filed its 2002 Form 10-K with the SEC.  The

12  2002 Form 10-K included McAfee's 2002 financial statements, which were materially false and

13  misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

14  options.  As a result, McAfee's compensation expense was understated and its net earnings were

15  overstated.

16        185.    The Form 10-K included the same knowingly false and misleading statement that

17  "[t]he McAfee Plan provided for an option price no less than 100% of the fair market value of

18  McAfee.com's common stock on the date of grant for incentive stock options granted to employees

19  and officers."

20        186.    The October 31, 2003 Form 10-K was signed by Samenuk, Richards, Bucknam,

21  Denend, Dutkowsky, O'Leary, Pangia and Wilson.

22  **The False 2003 Amendments to the 2000 Form 10-K**

23        187.    On October 31, 2003, the Company filed it's Form 10-K/A for the year 2000.  In the

24  2003 Form 10-K/A, defendants knowingly and falsely stated that it accounted for stock-based

25  compensation in accordance with APB No. 25.

26        188.    The Form 10-K/A stated: "Other than options granted with exercise prices of $0.01

27  per share, all options were granted at an exercise price equal to the fair market value of the common

28  stock on the date of grant."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    - 59 -

1    189.    The October 31, 2003 Amendment to the 2000 Form 10-K was signed by Samenuk,

2   Richards, Bucknam, Denend, Dutkowsky, O'Leary, Pangia and Wilson.

3   **The False 2003 Form 10-K**

4    190.    On March 9, 2004, the Company filed its 2003 Form 10-K with the SEC. The 2003

5   Form 10-K included McAfee's 2003 financial statements, which were materially false and

6   misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

7   options. As a result, McAfee's compensation expense was understated and its net earnings were

8   overstated.

9    191.    The Form 10-K included the same knowingly false and misleading statement that

10   "[t]he McAfee Plan provides for an option price no less than 100% of the fair market value of

11   McAfee.com's common stock on the date of grant for incentive stock options granted to employees

12   and officers."

13    192.    The 2003 Form 10-K was signed by Samenuk, Richards, Bucknam, Denend,

14   Dutkowsky, O'Leary, Pangia and Wilson.

15   **The False 2004 Form 10-K**

16    193.    On March 31, 2005, the Company filed its 2004 Form 10-K with the SEC. The 2004

17   Form 10-K included McAfee's 2004 financial statements, which were materially false and

18   misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

19   options. As a result, McAfee's compensation expense was understated and its net earnings were

20   overstated.

21    194.    The Form 10-K also falsely stated that McAfee accounted for stock-based

22   compensation in accordance with APB No. 25.

23    195.    The Company expanded on what it meant by accounting for stock-based

24   compensation under APB No. 25:

25         Accordingly, with respect to fixed-plan awards, the Company measures the excess, if
           any, of the market value of its common stock on the date of the award over the
26         exercise price of options granted as deferred compensation expense (intrinsic
           method) and recognizes any such excess over the vesting period using the straight-
27         line method.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

196.    Defendants knew or deliberately disregarded that this statement was false, because the Company was backdating options to a date with a lower closing price and the options therefore had an exercise price lower than the market value of the stock on the actual day of the grant. McAfee has admitted that it will have to restate its financial results back to 2001 because "the actual accounting measurement dates for certain historical stock options differ from the measurements dates previously used for such awards."

197.    The 2004 Form 10-K was signed by Samenuk, Richards, Bucknam, Denend, Dutkowsky, O'Leary, Pangia and Wilson. It was certified by Samenuk and Brown.

**The False 2005 Form 10-K**

198.    On March 1, 2006, the Company filed its 2005 Form 10-K with the SEC.[11] The 2005 Form 10-K included McAfee's 2005 financial statements, which were knowingly materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, McAfee's compensation expense was understated and its net earnings were overstated.

199.    The March 1, 2006 Form 10-K was signed by Samenuk, Bucknam, Brown, Denend, Dutkowsky, Fuller, O'Leary, Pangia and Wilson. It was certified by Samenuk and Brown.

---

[11]    In McAfee's March 1, 2006 10-K, the Company incorporated by reference the following documents: Form 8-K filed on July 16, 2004; Form 10-Q for the quarter ended September 30, 2004, filed on November 8, 2004; Form S-4 filed on March 25, 1998; Form 10-K for the year ended December 31, 2002, filed on October 31, 2003; Form 10-Q for the quarter ended September 30, 1996, filed on November 14, 1996; Form 8-A filed on October 22, 1998; S-3 filed on November 9, 2001; S-3, filed on February 11, 1998; S-8 filed on July 27, 2005; Form 10-K for the year ended December 31, 2000, filed on April 2, 2001; Form 10-K for the year ended December 31, 2001, filed on February 8, 2002; Form 10-Q for the quarter ended March 31, 2001, filed on May 15, 2001; Form 10-Q for the quarter ended September 30, 2001, filed on November 13, 2001; Form 10-K for the year ended December 31, 2001, filed on February 8, 2002; Form 10-Q for the quarter ended September 30, 2002, filed on November 12, 2002; Form S-8 filed on November 5, 2003; Form 10-K for the year ended December 31, 2003, filed on March 9, 2004; Form 10-Q for the quarter ended March 31, 2004, filed on May 10, 2004; Form 8-K filed on September 7, 2004; Form 10-Q for the quarter ended June 30, 2004, filed on August 9, 2004; Form 10-Q for the quarter ended September 30, 2004, filed on November 8, 2004; Form 8-K filed on December 14, 2004; Form 10-K/A for the year ended December 31, 2004, filed on May 24, 2005; Form 8-K filed on April 22, 2005; and Form 8-K filed on April 26, 2005.

1    200.    During the Relevant Period, defendants caused McAfee's shares to trade at artificially

2  inflated levels by issuing a series of materially false and misleading statements regarding the

3  Company's financial statements, business and prospects.  Specifically, defendants caused or allowed

4  McAfee to issue statements that failed to disclose or misstated that: (a) the Company had inadequate

5  internal controls that prevented it from issuing accurate financial reports and projections; (b) because

6  of improperly recorded stock-based compensation expenses the Company's financial results violated

7  GAAP; and (c) the Company's public disclosures presented an inflated view of McAfee's earnings.

8    201.    The 1997-2005 Proxy Statements concealed defendants' option backdating scheme.

9  Thus, the Company's shareholders remained unaware of defendants' wrongdoing when voting on

10  proxy proposals between 1997 and 2006.  In fact, it was not until the CFRA published a study on at-

11  risk companies for stock option backdating that shareholders learned that the Proxy Statements

12  which they had relied upon for nearly a decade were false and misleading.  Defendants have been

13  unjustly enriched at the expense of McAfee, which has received and will receive less money from

14  defendants when they exercise their options at prices substantially lower than they would have if the

15  options had not been backdated.

16    202.    Each dollar diverted to defendants via the option backdating scheme has come at the

17  expense of the Company.  For example, if Richards' 600,000 options granted in 2001 had not been

18  manipulated, but rather had a strike price of $7.45, the day he started working for McAfee, instead of

19  the $6.00 strike price – which was the trading low for the year at any time after February 23, 2001,

20  when Richards exercised those options – the Company would have received an additional $870,000

21  from this single options grant.

## COMPANY REVELATIONS AND ADMISSIONS

23    203.    Contrary to McAfee's public representations that stock options bore an exercise price

24  equal to the fair market value of the stock on the date of the grant, McAfee was manipulating the

25  dates of the option grants so that they would bear a date with an exercise price lower than that of the

26  common stock on the actual date of the grant.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

204.    On May 25, 2006, McAfee announced that it was conducting an internal investigation of its options-granting practices in the late 1990s and early 2000s. McAfee also acknowledged that it was in dialogue with the SEC on an informal basis.

205.    On May 30, 2006, McAfee announced that it had fired its general counsel, defendant Roberts, as a result of the internal review. Roberts was purportedly fired in connection with "one episode involving the General Counsel in 2000 that was improper."

206.    On June 9, 2006, McAfee filed a Form 8-K admitting that it had received a subpoena from the SEC related to the options-granting practices.

207.    On July 27, 2006, McAfee announced that the Special Committee carrying out the review had concluded that "the actual accounting measurement dates for certain historical stock options differ from the measurement dates previously used for such awards." McAfee stated that it would adjust the measurement dates and that it was "more likely than not that the amount of such additional adjustments relating to prior periods will be material and that McAfee will restate its financial statements in at least one, and potentially several, prior periods." The Company then admitted that, as a result, its previously issued quarterly and annual financial statements for fiscal years 2003 through the first quarter of 2006 "should no longer be relied upon." The Company later amended its 8-K to state that the data from 2002 and 2001 included in its later financial statements should also no longer be relied upon. Although the review was not complete, the Company warned that it expected that "expenses arising from the Special Committee's review, any potential restatement of financial statements and related activities, which will be recorded in the periods incurred, will be significant."

208.    On August 10, 2006, McAfee admitted that, because of the ongoing review of the options-granting process, the Company would not timely file its Form 10-Q for the quarter ended June 30, 2006. The Company admitted that it would likely restate its financial results for "at least one, and potentially several, prior periods, to reflect additional stock compensation and/or tax related impact." McAfee also admitted on July 27, 2006 in a conference call with analysts that the Company was "evaluating the impact of [the options-granting] matter on its Sarbanes-Oxley §302

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   internal control certification over financial reporting and its reports thereon for the years 2004 and

2   2005."

3        209.    On July 27, 2006, McAfee issued a Form 8-K with the SEC admitting that its review

4   of historical stock option grants had uncovered that indeed the grant date and record dates of options

5   granted during the Relevant Period were inconsistent and that its financial statements were likely in

6   violation of GAAP and Accounting Principles Board Opinion No. 25. The Form 8-K also revealed

7   that the necessary adjustments to its financial would in fact be material, therefore requiring a

8   restatement of financial results for 2003, 2004 and 2005:

9            As a result of McAfee's previously announced independent review of its
10   historical stock option grant practices and related accounting, McAfee's Special
      Committee of independent directors conducting this review has reached the
      conclusion that, pursuant to the requirements of Accounting Principles Board
11   Opinion No. 25, Accounting for Stock Issued to Employees (APB 25), the actual
      accounting measurement dates for certain historical stock options differ from the
12   measurement dates previously used for such awards. The Special Committee has not
      yet completed its review. As a result, the Special Committee has determined that
13   new accounting measurement dates will apply to the affected option grants. McAfee
      believes that it is more likely than not that the amount of such additional adjustments
14   relating to prior periods will be material and that McAfee will restate its financial
      statements in at least one, and potentially several, prior periods.
15

16            McAfee has concluded that its previously issued financial statements for the
      fiscal years 2003, 2004, 2005, which are included in the Company's Annual Report
17   on Form 10-K for the year ended December 31, 2005, the Quarterly Reports on Form
      10-Q filed with respect to each of these fiscal years and the financial statements
      included in the Company's Quarterly Report on Form 10-Q for the first quarter of
18   fiscal year 2006, should no longer be relied upon. In addition, in the event that a
      restatement of these financial statements is required, it likely will affect financial
19   statements for prior periods.

20        210.    On August 18, 2006, McAfee acknowledged that it had received a grand jury

21   subpoena from the United States Attorney's office regarding the termination of Roberts and the

22   investigation of options backdating.

23        211.    On October 11, 2006, the Company announced that, following the Special Committee

24   report on historical stock option grant practices, defendant Samenuk has retired and defendant Weiss

25   has been fired:

26            On October 11, 2006, McAfee, Inc. ("McAfee") issued a press release
      announcing that George Samenuk, its Chairman of the Board and Chief Executive
27   Officer, has retired from McAfee, that Kevin Weiss, its President, has been
      terminated by McAfee, that Dale L. Fuller has been appointed as Interim President
28   and Chief Executive Officer, and that Charles J. Robel has been appointed non-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    executive Chairman of the Board. The foregoing personnel actions followed the
2    presentation to the McAfee Board of Directors of the determinations by the Special
     Committee of independent directors regarding the previously announced
3    investigation of McAfee's historical stock option grant practices and related
     accounting.

4        212.    On the same day, October 11, 2006, McAfee further announced that its review had

5    concluded that the options backdating scheme would require restatement of ten years of false

6    reported financials:

7            Following the substantial completion of the Special Committee's previously
         announced internal review of McAfee's stock option grant practices, conducted with
8        the assistance of independent counsel and forensic accountants, McAfee has
         determined that it will need to restate historical financial statements to record
9        additional non-cash charges for stock-based compensation expense over a ten year
         period. Based on that preliminary review, McAfee announced that it currently
10       believes that the amount of the restatement required to record such charges is likely
         to be in the range of $100 to 150 million. McAfee and its independent auditors will
11       be reviewing recent guidance released by the Office of the Chief Accountant of the
         SEC and have not yet conclusively determined the exact amount of such charges, the
12       resulting tax and accounting impact, or which specific prior periods require
         restatement. McAfee intends to file its restated financial results and Annual Report
13       on Form 10-K as quickly as practicable.

14       213.    On October 26, 2006, the Company issued a press release announcing that its

15   preliminary results for the third quarter fiscal 2006 again stating that it expects that the restatement

16   related to its stock option investigation will range between $100-$150 million. In addition, because

17   of the restatement, the Company is still unable to timely file its Form 10-Q for the third quarter.

18       214.    On December 29, 2006, McAfee issued a press release announcing the repricing of

19   stock options, which represented merely that "a small subset of the overall measurement date

20   changes and strike price changes that McAfee expects it will have to make in the future as a result of

21   its stock option review and pending restatement of its previously filed financials." The press release

22   admitted to numerous mispriced options grants to several defendants, including grants to Samenuk

23   on May 4, 2004, and January 16, 2002, and grants to Weiss on October 15, 2002, July 16, 2003,

24   December 10, 2003, and May 4, 2004. Further, defendants Denend, O'Leary and Wilson also

25   received mispriced options which had to be repriced.

26                    **TOLLING OF THE STATUTE OF LIMITATIONS**

27       215.    The Counts alleged herein are timely. As an initial matter, defendants wrongfully

28   concealed their manipulation of the Stock Option Plans, through strategic timing and fraudulent

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 65 -

1  backdating, by issuing false and misleading Proxy Statements, by falsely reassuring McAfee's public

2  investors that McAfee's option grants were being administered by a committee of independent

3  directors, and by failing to disclose that backdated options were, in fact, actually issued on dates

4  other than those disclosed, and that strategically timed option grants were issued based on the

5  manipulation of insider information that ensured that the true fair market value of the Company's

6  stock was, in fact, higher than the publicly traded price on the date of the option grant.

7       216.    McAfee's shareholders and the investing public had no reason to know of defendants'

8  breach of their fiduciary duties until May 2006, when the CFRA published its report detailing the

9  option practices of McAfee and other companies.

10      217.    Finally, as fiduciaries of McAfee and its public shareholders, defendants cannot rely

11  on any limitations defense where they withheld from McAfee's public shareholders the facts that

12  give rise to the claims asserted herein, *i.e.*, that the McAfee Board had abdicated its fiduciary

13  responsibilities to oversee the Company's executive compensation practices, and that the option

14  grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to

15  maximize the costs for the Company.

16                              **DEMAND FUTILITY**

17      218.    The current Board consists of defendants Bucknam, Denend, Dutkowsky, O'Leary,

18  Pangia and Fuller, as well as non-defendant Chuck Robel. Plaintiff did not make a demand upon the

19  Board of McAfee at the time of suit to institute this action. Based upon the facts set forth throughout

20  this Complaint, applicable law and the longstanding rule that equity does not compel a useless and

21  futile act, a pre-filing demand upon the McAfee Board to institute this action against the officers and

22  members of the McAfee Board is excused as futile.

23      219.    Prior demand upon a board of directors is excused if plaintiff alleges facts that, if true,

24  raise a reasonable doubt that: (a) the challenged transaction was the product of a valid business

25  judgment; or (b) a majority of the directors are disinterested and independent. If either prong of this

26  test is satisfied, demand is excused.

27      220.    By reason of their corporate positions and their ability to control the business and

28  corporate affairs of McAfee at all relevant times, the directors of McAfee owed McAfee and its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 66 -

1  stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were required to use
2  their ability to control McAfee in a fair, just and equitable manner, as well as to act in furtherance of
3  the best interests of McAfee and its stockholders.  In addition, the directors owed McAfee the
4  fiduciary duty to exercise due care and diligence in the management and administration of the affairs
5  of McAfee and in the use and prevention of its property and assets.  In violation of their fiduciary
6  duties, defendants approved of and/or caused McAfee to issue illegally backdated stock options to
7  many of its employees for a period beginning in at least 1996 and continuing until no earlier than
8  2004.

9  **A Majority of McAfee's Directors Are Not Independent and Disinterested**

10      221.    In addition to the fact that backdating stock options is not protected by the business
11  judgment rule, demand is excused because plaintiff can show a reasonable doubt that the majority of
12  directors were not disinterested or independent at the time that this action was filed.

13      222.    A majority of McAfee's Board are interested and/or incapable of independently
14  evaluating the claims in this lawsuit.  Of the eight members of the Board at the time this action was
15  filed, at least six of them have significant conflicts which creates a reasonable doubt as to their
16  independence or disinterestedness, thus making a demand on the Board futile and useless.  In
17  particular:

18          (a)    Defendant Samenuk was both Chairman of the Board of Directors and CEO of
19  McAfee. Because of these dual roles, Samenuk was incapable of exercising independent judgment
20  regarding this action.  Further, Samenuk was a participant in, and direct beneficiary of, the illegal
21  options backdating scheme. On January 2, 2001, Samenuk received options to purchase 1,200,000
22  shares of McAfee stock.  On this date, McAfee stock was trading at the third lowest price of year.
23  On January 16, 2002, Samenuk received options to purchase 420,000 shares of McAfee stock.  On
24  this date, McAfee stock was trading at the second lowest price for the month.  Samenuk also
25  received options which had to be repriced on May 4, 2004.  To date, Samenuk has realized ***profits of***
26  ***over $33.5 million from options granted on highly suspect dates***.  He also continues to hold a
27  significant number of unexercised options from highly suspect grant dates. In addition, from at least
28  2001-2003, Samenuk, and defendant Garcia-Lechelt met to determine the stock option awards for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 67 -

1   senior McAfee executives. In this capacity, Samenuk was directly responsible for manipulating the

2   grant date of certain stock options. There can be no doubt that these conflicts make Samenuk

3   interested in these transactions, and completely incapable of exercising independent judgment

4   regarding this lawsuit. On October 11, 2006, McAfee announced that Samenuk had "retired" from

5   McAfee following the Special Committee's presentation of the their investigation of McAfee's

6   historical stock option grant practices and related accounting;

7             (b)      Defendant Denend has been a director of McAfee since June 1995. He was

8   President of McAfee from December 1997 to April 1998, and was President and CEO of Network

9   General from June 1993 until December 1997. Further, Denend served on McAfee's Audit

10  Committee during 1998, as well as the Compensation Committee from 1995-1999, and again in

11  2002. While Denend was President of McAfee, several senior executives, including himself, were

12  given options to purchase over 1,000,000 shares of McAfee stock. Certain of these options bore date

13  of January 12, 1998 – the lowest stock price of the year. Denend also received numerous mispriced

14  options grants between 2002 and 2006 that have subsequently had to be repriced. Denend is

15  interested in the transactions in question because in his role as president and director he either knew

16  or was reckless in not knowing that option grant dates were being backdated. Denend is also

17  incapable of exercising independent judgment because of his multiple connections with McAfee

18  executives. As a former president of the Company, Denend has inextricable links with McAfee's

19  management that make it impossible for him to exercise independent judgment regarding these

20  transactions. Denend's independence is further called into question by his position on the board of

21  directors of Verifone, Inc. Verifone has been a business partner of McAfee's since at least 2004.

22  Denend has been sued on multiple occasions while serving on various boards of directors. In 1991,

23  he was as named defendant in civil litigation against 3Com. In 1992, he was a named defendant in a

24  securities fraud prosecution against Vitalink Communications. In 2001, he was a named defendant

25  in numerous federal securities fraud cases against Adaptive Broadband. He was a named defendant

26  in numerous state civil cases filed against the officers and directors of Rational Software. Last, he

27  was also a named defendant in previous securities fraud cases against McAfee, which involved

28  deliberate revenue inflation and led to McAfee signing a consent order with the SEC in 2006. The

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 68 -

1   aggregate of these facts make it clear that Denend could not have evaluated a demand made on the

2   Company in a disinterested and independent manner had one been made in March 2006;

3          (c)    Defendant Dutkowsky has been a director of McAfee since April 2001 and the

4   lead independent director since March 2004.  On October 4, 2006, McAfee announced that

5   Dutkowsky intended to resign from the Board by no later than January 31, 2007. He served on the

6   Audit Committee from 2002-2005, and on the Compensation Committee from April 2001-2005.

7   Dutkowsky was on the Compensation Committee during the time that at least three publicly reported

8   and highly suspect grants were given at McAfee.  As chair of the Compensation Committee,

9   Dutkowsky was directly responsible for supervising the administration of stock grants given under

10  McAfee's Stock Plans and their 2000 Non-Statutory Stock Plan during this period. In that capacity,

11  Dutkowsky knew or was reckless in not knowing that McAfee was backdating stock option grants on

12  a consistent basis.  Further, Dutkowsky's professional relationships with other Board members,

13  particularly CEO Samenuk, also make him unable to objectively evaluate this claim. While recently

14  removed from McAfee's Proxy Statements, Dutkowsky spent the majority of his professional career

15  at IBM – during the same time that Samenuk worked there.  During this time, they likely developed

16  a close professional relationship as they both worked as senior executives in IBM's operations in

17  Asia. This relationship is particularly problematic as Dutkowsky is supposed to be acting as the lead

18  independent director on McAfee's Board.  Instead, Dutkowsky is beholden to Samenuk and

19  McAfee's officers, and would not vote for litigation that would subject them, and indeed himself, to

20  liability in this action. Because of these connections, and because Dutkowsky either participated in

21  the backdating of options, or completely abdicated his duties in failing to discovery the conduct, he

22  is interested in this litigation and cannot be expected to exercise independent judgment;

23          (d)    Defendant Pangia has been a director of the Company since April 2001.  He

24  served as a member of the Audit Committee from 2001-2005 and now chairs that committee. He has

25  also served on the Compensation Committee since April 2002.  Pangia was on the Compensation

26  Committee during the time that at least one highly suspect grant was given at McAfee.  In that

27  capacity, Pangia knew or was reckless in not knowing that McAfee was backdating stock option

28  grants on a consistent basis. Because Pangia either participated in this fraud, or was complicit in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 69 -

1   allowing it to occur, he cannot be expected to exercise independent judgment regarding these

2   transactions; and

3           (e)    Defendant Wilson has been a director of the Company since 2002. She was

4   on the Compensation Committee from 2002-July 2003 – during the time that at least one highly

5   suspect grant was given at McAfee. She also received mispriced options which the Company

6   announced had to be repriced. She has been on the Audit Committee since 2002. She has been on

7   the Governance and Nominations Committee since 2003, which she now chairs. As a member of the

8   Governance and Nominations Committee, Wilson was responsible for developing and

9   recommending to the Board the governance principles applicable to the Company and for overseeing

10  the evaluation of the Board and management. Wilson clearly abdicated these responsibilities as she

11  allowed the backdating of stock options to occur on her watch, and would be incapable of exercising

12  independent judgment regarding these transactions.

13          (f)    Defendant O'Leary served on McAfee's Compensation Committee from at

14  least 2003 until the present. As a member of McAfee's Compensation Committee during this time,

15  O'Leary was responsible for approving numerous mispriced options to defendants. Indeed,

16  McAfee's December 29, 2006 press release admitted that O'Learly himself had been granted

17  numerous mispriced options, the repricing of which could cost O'Leary over $100,000.

18      223.    Furthermore, demand would be a futile and useless act for the following additional

19  reasons:

20          (a)    A majority of the current McAfee Board participated in or approved many of

21  the acts and omissions or were on notice of and/or recklessly disregarded the wrongs complained of

22  herein;

23          (b)    McAfee's Board ultimately had to approve all option grants. Some of the

24  directors themselves received options by virtue of their employment at McAfee that were likely

25  backdated.

26          (c)    Regardless of whether any individual director received a backdated grant, all

27  of McAfee's directors benefited from the option backdating because it allowed McAfee to overstate

28  its profits and understate its compensation expenses for the years in question. Thus, every time the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   directors exercised McAfee stock options – backdated or not – they were doing so with knowledge

2   that McAfee's stock price was illegally overstated because of their approval of, or acquiescence to,

3   these fraudulent practices.  They have thus benefited from the wrongdoing herein alleged and are

4   incapable of exercising independent objective judgment in deciding whether to bring this action.

5           (d)    Directors who were the members of McAfee's Compensation Committee of

6   the Board are interested and not capable of exercising independent judgment regarding these

7   transactions because this committee was directly responsible for supervising the administration of

8   stock grants given under McAfee's 1997 Stock Plan and their 2000 Non-Statutory Stock Plan during

9   this period.  As such, they were either aware that option grant dates were been manipulated, or

10  abdicated their responsibilities to ensure that such conduct was not occurring and therefore are

11  substantially likely to be held liable for the misconduct complained of herein.  These directors

12  cannot be expected to vigorously pursue litigation that is based on conduct they approved, or duties

13  they abdicated;

14          (e)    Directors who were members of McAfee's Audit Committee of the Board are

15  also interested and not capable of exercising independent judgment regarding these transactions.

16  The Audit Committee reviews, acts and reports to McAfee's Board on various auditing and

17  accounting matters.  Amongst other things, the Audit Committee is responsible for ensuring the

18  quality and integrity of McAfee's financial statements, and the adequacy and effectiveness of the

19  Company's accounting and financial controls.  The members of the Audit Committee either failed to

20  exercise due care in ensuring that McAfee had sufficient financial controls to prevent this kind of

21  conduct, or knowingly consented to the granting of illegal and backdated of stock options, and

22  therefore are substantially likely to be held liable for the misconduct complained of herein.  In either

23  respect, the members of the Audit Committee cannot be expected to vigorously pursue litigation

24  related to stock option backdating, because it was only through inadequate and ineffective

25  accounting and financial controls that this conduct could have occurred.

26          224.   Because plaintiff can show a reasonable doubt that a majority of McAfee's directors

27  at the time of suit were disinterested and independent at the time of suit, and because the challenged

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 71 -

transaction was clearly not the product of a valid business judgment, a demand upon McAfee's Board would be futile and is excused.

**Options Backdating Is Not the Product of Business Judgment Because It Is _Ultra Vires_, Illegal, and Contrary to the Stated Purpose of the Stock Option Plans**

225.    The practice of granting illegal and backdated stock options is not protected by the business judgment rule because it is ultra vires. The Stock Option Plans under which these options were purportedly given, and the Proxy Statements disclosing grants to senior executives during this time period, all represented and required that the stock grants in question be priced based on the fair market value of McAfee stock on the day of the grant. The fair market value was to be determined by reference to the stock prices published in _The Wall Street Journal_ on the day of the grant.

226.    However, contrary to this limited authority given to the Board by McAfee's Stock Option Plans, and contrary to McAfee's representations in the proxy filings, many of McAfee's option grants between 1997 and at least 2004 were priced at a date earlier than the actual date on which they were granted. Because granting options using manipulated grant dates to lower the strike price of the options is not permitted by the Stock Option Plans, this conduct is _ultra vires_ and void on its face. _Ultra vires_ acts are not protected by the business judgment rule, and thus demand is excused.

227.    Additionally, defendants' conduct caused McAfee to issue materially false financial reports and proxy reports for the entirety of the period in question, in violation of numerous provisions of the federal securities laws. Each Defendant violated §10(b) and Rule 10b-5 of the Exchange Act by participating this fraudulent scheme. Each defendant violated §14(a) of the Exchange Act by issuing false and misleading Proxy Statements from 1997 to 2005. And each Defendant violated §20(a) of the Exchange Act by being controlling persons of McAfee and engaging in the purchase and/or sale of McAfee stock while in the possession of material non-public information regarding McAfee's backdating scheme. Demand is excused because these are illegal acts that are not protected by the business judgment rule.

228.    Even if stock option backdating was not illegal, _ultra vires_, and void, there would be no plausible argument that backdating stock options was a valid exercise of business judgment. As

1  represented in McAfee's Proxy Statements, the stated purpose of McAfee's Stock Option Plans is to

2  encourage the productivity of McAfee employees by providing compensation that is proportional to

3  gains in McAfee's stock price.  However, by granting options with backdated strike prices,

4  defendants undermined the purpose of the Stock Option Plans by awarding employees compensation

5  that had intrinsic value regardless of gains in McAfee's stock price.  In effect, this practice was

6  nothing more than secret handouts to executives and employees at the expense of unsuspecting

7  shareholders and the market at large.

8      229.    Defendants could have achieved the stated purpose of attracting and retaining

9  qualified employees by granting those employees additional options under their incentive plans, or

10  by granting options at a price less than the fair market value on the day of the grant and simply

11  disclosing and expensing these grants.  Instead, defendants intentionally concealed the backdating of

12  these grants and illegally reported these grants in their financial disclosures to improve their bottom

13  line.

14      230.    The practice of backdating stock options could not have been a valid exercise of

15  business judgment because it has subjected McAfee to potentially massive liability.  McAfee has

16  disclosed that they will likely have to restate financial statements for at least one, and possibly

17  several, past periods.  The Company's practices are being investigated by the SEC and DOJ.  The

18  Company will likely suffer tax liabilities for the additional compensation they will have to expense,

19  and they have tarnished their reputation in the investment community through this deliberate and

20  calculated conduct.

21      231.    Further, the alleged conduct is likely in violation of the consent order that McAfee

22  signed with the SEC on January 4, 2006.  This consent order, which alleged that McAfee violated

23  federal securities laws in connection with its overstatement of revenues between 1998 and 2000,

24  enjoined McAfee from violating the antifraud, books and records, internal controls, and periodic

25  reporting provisions of the federal securities laws.  If this present conduct is found to violate this

26  consent order, McAfee could be subject to even greater repercussions.  There is simply no legitimate

27  business justification for illegal conduct that results in such dire consequences.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

232.    The acts complained of herein constitute violations of law and breaches of the fiduciary duties owed by McAfee's Board and these acts are incapable of ratification;

(a)    In order to bring this action for breaching their fiduciary duties, the members of the McAfee Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do. Therefore, defendants would not be able to vigorously prosecute any such action;

(b)    The composition of McAfee's Board is designed to (and does) make them dependent on and deferential to the top officers of the Company and Chairman of the Board who as a practical matter control and dominate the process by which directors are selected for nomination or renomination to the Board;

(c)    If McAfee's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of McAfee. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past several years, the directors' and officers' liability insurance policies covering defendants in this case contain provisions which eliminate coverage for any action brought directly by McAfee against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of McAfee, there would be no directors' and officers' insurance protection and thus, this is a further reason why they would not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. If there is no directors' and officers' liability insurance at all, then defendants will not cause McAfee to sue them, since they will face a large uninsured liability;

233.    Plaintiff has not made any demand on shareholders of McAfee to institute this action since such demand would be a futile and useless act for the following reasons:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(a)    McAfee is a publicly traded Company with approximately 159 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act Against All Defendants

234.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235.    Throughout the Relevant Period, defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to divert hundreds of millions of dollars to defendants via improper option grants.

236.    Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about McAfee not misleading.

237.    Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by McAfee.

238.    Defendants acted with scienter throughout the Relevant Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were among the senior

1  management of the Company, and were therefore directly responsible for the false and misleading

2  statements and/or omissions disseminated to the public through press releases, news reports and

3  filings with the SEC.

4      239.    Each of the defendants participated in a scheme to defraud with the purpose and

5  effect of defrauding McAfee, which relied on defendants' fraud in granting them options to purchase

6  McAfee common stock.

7      240.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and

8  Rule 10b-5 promulgated thereunder, and caused McAfee to sustain damages, as alleged herein.

9                            **COUNT II**

10         **Violations of Section 14(a) of the Exchange Act**
                      **Against All Defendants**

11

12      241.    Plaintiff incorporates by reference and realleges each and every allegation set forth

13  above, as though fully set forth herein.

14      242.    Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no

15  Proxy Statement shall contain "any statement which, at the time and in the light of the circumstances

16  under which it is made, is false or misleading with respect to any material fact, or which omits to

17  state any material fact necessary in order to make the statements therein not false or misleading."

    17 C.F.R. §240.14-A-9.

18

19      243.    The 1997-2005 Proxy Statements violated §14(a) and Rule 14-A-9 because they

20  omitted material facts, including the fact that defendants were causing McAfee to engage in an

21  option backdating scheme, a fact which defendants were aware of and participated in from at least

    1997.

22

23      244.    In the exercise of reasonable care, defendants should have known that the Proxy

24  Statements were materially false and misleading.

25      245.    The misrepresentations and omissions in the Proxy Statements were material to

26  plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the

27  accomplishment of the continuation of defendants' unlawful stock option backdating scheme, as

28  revelations of the truth would have immediately thwarted a continuation of shareholders'

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  endorsement of the directors' positions, the executive officers' compensation and the Company's

2  compensation policies, and amendments to the Company's Stock Option Plans.

3      246.    The Company was damaged as a result of the material misrepresentations and

4  omissions in the Proxy Statements, because, among other things, the Company awarded hundreds of

5  thousands of stock options pursuant to plans that were invalidly approved by shareholders.

6                                      **COUNT III**

7                  **Violations of Section 20(a) of the Exchange Act**
                              **Against All Defendants**

8

9      247.    Plaintiff incorporates by reference and realleges each and every allegation set forth

10  above, as though fully set forth herein.

11      248.    The defendants named in this Count, by virtue of their positions with McAfee and

12  their specific acts, were, at the time of the wrongs alleged herein, controlling persons of McAfee

13  within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised

14  the same to cause McAfee to engage in the illegal conduct and practices complained of herein.

15                                      **COUNT IV**

16                                      **Accounting**

17      249.    Plaintiff incorporates by reference and realleges each and every allegation set forth

18  above, as though fully set forth herein.

19      250.    At all relevant times, defendants, as directors and/or officers of McAfee, owed the

20  Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

21      251.    In breach of their fiduciary duties owed to McAfee and its shareholders, defendants

22  caused McAfee, among other things, to grant backdated stock options to themselves and/or certain

23  other officers and directors of McAfee.  By this wrongdoing, defendants breached their fiduciary

24  duties owed to McAfee and its shareholders.

25      252.    Defendants possess complete and unfettered control over their improperly issued

26  stock option grants and the books and records of the Company concerning the details of such

27  improperly backdated stock option grants to defendants.

28

253.    As a result of defendants' misconduct, McAfee has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

254.    Plaintiff demands an accounting be made of all stock option grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the defendants, as well as the disposition of any proceeds received by the defendants via sale or other exercise of backdated stock option grants received by the defendants.

## COUNT V

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

255.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

256.    Each of the defendants agreed to and did participate with Denend, Hodges and Richards and the other defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties defendants owed to the Company.

257.    Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to McAfee and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of McAfee and its shareholders.

258.    As demonstrated by the allegations above, defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to McAfee and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding defendants' option backdating scheme.

259.    By reason of the foregoing acts, practices and course of conduct, defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward McAfee and its public shareholders.

1    260.    As a proximate result of defendants' conduct, in concert with Denend, Hodges and

2    Richards, McAfee has been injured and is entitled to damages.

### COUNT VI

### Abuse of Control
### Against All Defendants

261.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

262.    Defendants employed the alleged scheme for the purpose of maintaining and

entrenching themselves in their positions of power, prestige and profit at, and control over, McAfee,

and to continue to receive the substantial benefits, salaries and emoluments associated with their

positions at McAfee.  As a part of this scheme, defendants actively made and/or participated in the

making of or aided and abetted the making of, misrepresentations regarding McAfee.

263.    Defendants' conduct constituted an abuse of their ability to control and influence

McAfee.

264.    By reason of the foregoing, McAfee has been damaged.

### COUNT VII

### Gross Mismanagement
### Against All Defendants

18    265.    Plaintiff incorporates by reference and realleges each and every allegation set forth

19    above, as though fully set forth herein.

20    266.    Defendants had a duty to McAfee and its shareholders to prudently supervise, manage

21    and control the operations, business and internal financial accounting and disclosure controls of

22    McAfee.

23    267.    Defendants, by their actions and by engaging in the wrongdoing described herein,

24    abandoned and abdicated their responsibilities and duties with regard to prudently managing the

25    businesses of McAfee in a manner consistent with the duties imposed upon them by law.  By

26    committing the misconduct alleged herein, defendants breached their duties of due care, diligence

27    and candor in the management and administration of McAfee's affairs and in the use and

28    preservation of McAfee's assets.

1    268.    During the course of the discharge of their duties, defendants knew or recklessly

2  disregarded the unreasonable risks and losses associated with their misconduct, yet defendants

3  caused McAfee to engage in the scheme complained of herein which they knew had an unreasonable

4  risk of damage to McAfee, thus breaching their duties to the Company.  As a result, defendants

5  grossly mismanaged McAfee.

6    269.    By reason of the foregoing, McAfee has been damaged.

7                                    **COUNT VIII**

8                               **Constructive Fraud**
                               **Against All Defendants**
9

10    270.    Plaintiff incorporates by reference and realleges each and every allegation set forth

11  above, as though fully set forth herein.

12    271.    As corporate fiduciaries, defendants owed to McAfee and its shareholders a duty of

13  candor and full accurate disclosure regarding the true state of McAfee's business and assets and their

14  conduct with regard thereto.

15    272.    As a result of the conduct complained of, defendants made, or aided and abetted the

16  making of, numerous misrepresentations to and/or concealed material facts from McAfee's

17  shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of

18  McAfee.  Thus they have committed constructive fraud and violated their duty of candor.

19    273.    By reason of the foregoing, McAfee has been damaged.

20                                    **COUNT IX**

21                               **Corporate Waste**
                               **Against All Defendants**

22    274.    Plaintiff incorporates by reference and realleges each and every allegation set forth

23  above, as though fully set forth herein.

24    275.    By failing to properly consider the interests of the Company and its public

25  shareholders, by failing to conduct proper supervision, by giving away millions of dollars to

26  defendants via the option backdating scheme, defendants have caused McAfee to waste valuable

27  corporate assets.

28    276.    As a result of defendants' corporate waste, they are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 80 -

## COUNT X

### Unjust Enrichment
### Against All Defendants

277.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

278.   As a result of the conduct described above, defendants will be and have been unjustly enriched at the expense of McAfee, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

279.   Certain defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up defendants' complicity in the scheme.

280.   All the payments and benefits provided to defendants were at the expense of McAfee. The Company received no benefit from these payments.  McAfee was damaged by such payments.

281.   Certain of the defendants sold McAfee stock for a profit during the period of deception, misusing confidential non-public corporate information.  These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of McAfee.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT XI

### For Rescission
### Against All Defendants

282.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

283.   As a result of the acts alleged herein, the stock option contracts between the Defendants and McAfee entered into during the Relevant Period were obtained through defendants' fraud, deceit and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding Defendants' employment agreements and the Company's stock option plan which was also approved by McAfee shareholders and filed with the SEC.

284.   All contracts which provide for stock option grants between the Defendants and McAfee and were entered into during the Relevant Period should, therefore, be rescinded, with all

1  sums paid under such contracts returned to the Company, and all such executory contracts cancelled
2  and declared void.

## COUNT XII

### For Breach of Contract
### Against Defendants Samenuk and Richards

285.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

286.    As a result of the backdating of options granted to them, defendants Samenuk and Richards have breached their employment agreements with McAfee and violated the Stock Option Plans, all of which provide that the exercise price of all of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for McAfee stock, on the date of the grant.

287.    McAfee and its shareholders have been damaged by defendants Samenuk's and Richards' breach of contract.

## COUNT XIII

### Violation of California Corporations Code Section 25402
### Against the Insider Selling Defendants

288.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

289.    At the time that the Insider Selling Defendants sold their McAfee common stock as set forth herein, by reason of their high executive and/or directorial positions with McAfee, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of McAfee's and option backdating improper accounting and false financial statements.

290.    At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of McAfee shares at that time.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   291.   The Insider Selling Defendants, and each of them, had actual knowledge of material,

2   adverse non-public information and thus sold their McAfee common stock in California in violation

3   of California Corporations Code §25402.

4   292.   Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants,

5   and each of them, are liable to McAfee for damages in an amount up to three times the difference

6   between the price at which McAfee common stock was sold by these defendants, and each of them,

7   and the market value which McAfee common stock would have had at the time of the sale if the

8   information known to these defendants, and each of them, had been publicly disseminated prior to

9   that time and a reasonable time had elapsed for the market to absorb the information.

10   **COUNT XIV**

11   **For Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**
**Against the Insider Selling Defendants**

12

13   293.   Plaintiff incorporates by reference and realleges each and every allegation set forth

14   above, as though fully set forth herein.

15   294.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew the

16   information described above, and sold McAfee common stock on the basis of such information.

17   295.   The information described above was proprietary non-public information concerning

18   the Company's financial condition and future business prospects.  It was a proprietary asset

19   belonging to the Company, which the Insider Selling Defendants used for their own benefit when

20   they sold McAfee common stock.

21   296.   At the time of their stock sales, the Insider Selling Defendants knew that the

22   Company's net income was materially overstated.  The Insider Selling Defendants' sales of McAfee

23   common stock while in possession and control of this material adverse non-public information was a

24   breach of their fiduciary duties of loyalty and good faith.

25   297.   Since the use of the Company's proprietary information for its own gain constitutes a

26   breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition

27   of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 83 -

**PRAYER FOR RELIEF**

1  WHEREFORE, plaintiff demands judgment as follows:

2  A.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

6  B.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

10  C.    Directing McAfee to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance Policies:

15  (i)    A proposal requiring that the office of CEO of McAfee and Chairman of the McAfee Board be permanently held by separate individuals and that the Chairman of the McAfee Board meets rigorous "independent" standards;

18  (ii)    A proposal to strengthen the McAfee Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

21  (iii)    Appropriately test and then strengthen the internal audit and control functions;

23  (iv)    Rotate independent auditing firms every five years;

24  (v)    Control and limit insider stock selling and the terms and timing of stock option grants; and

26  (vi)    Reform executive compensation.

27  D.    Ordering the imposition of a constructive trust over defendants' stock options and any proceeds derived therefrom;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    E.    Awarding punitive damages;

2    F.    Awarding costs and disbursements of this action, including reasonable attorneys',

3 accountants', and experts' fees; and

4    G.    Granting such other and further relief as this Court may deem just and proper.

5                              **JURY DEMAND**

6    Plaintiff demands a trial by jury

7 DATED:  August 7, 2007              LERACH COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
8                                     SHAWN A. WILLIAMS

9

10                                    SHAWN A. WILLIAMS

11
                                      100 Pine Street, Suite 2600
12                                    San Francisco, CA  94111
                                      Telephone:  415/288-4545
13                                    415/288-4534 (fax)

14                                    LERACH COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
15                                    DARREN J. ROBBINS
                                      TRAVIS E. DOWNS III
16                                    655 West Broadway, Suite 1900
                                      San Diego, CA  92101-3301
17                                    Telephone:  619/231-1058
                                      619/231-7423 (fax)
18
                                      THE WEISER LAW FIRM, P.C.
19                                    ROBERT B. WEISER
                                      121 N. Wayne Avenue, Suite 100
20                                    Wayne, PA  19087
                                      Telephone:  610/225-2677
21                                    610/225-2678 (fax)

22 S:\CasesSD\McAfee Derivative\CPT00044357.doc    Attorneys for Plaintiff

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                              - 85 -

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2      Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3  named parties, there is no such interest to report.

4

5

6  ATTORNEY OF RECORD FOR PLAINTIFF
   DENNIS K. WEBB

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MCAFEE INC. VERIFICATION

I, Dennis K. Webb, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: 8/1/07

**DENNIS WEBB**